**GULF OIL CORPORATION,**
Appellant in No. 89–2049

v.

**COMMISSIONER OF
INTERNAL REVENUE.**

**COMMISSIONER OF INTERNAL REVENUE,** Appellant in No. 89–2050

v.

**GULF OIL CORPORATION.**

Nos. 89–2049, 89–2050.

United States Court of Appeals,
Third Circuit.

Argued June 28, 1990.

Decided Sept. 11, 1990.

---

**398**

J.W. Bullion (argued), Emily A. Parker (argued), Thompson & Knight, Dallas, Tex., for Gulf Oil Corp.

Brian C. Griffin, Acting Asst. Atty. Gen., Gary R. Allen, Ann Belanger Durney, David I. Pincus (argued), Charles Bricken (argued), John A. Dudeck, Jr., Tax Div., Dept. of Justice, Washington, D.C., for C.I.R.

Before SLOVITER and MANSMANN, Circuit Judges, and THOMPSON, District Judge.[*]

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

Gulf Oil Corporation and the Commissioner of Internal Revenue cross-appeal several decisions of the U.S. Tax Court involving Gulf's corporate tax liability for tax years 1974 and 1975.

Gulf, both directly and through its foreign subsidiaries and affiliates, explores, develops, produces, purchases and transports crude oil and natural gas world-wide, and manufactures, transports and markets petroleum products. Gulf is an accrual method taxpayer using the calendar year as its tax year. During 1974 and 1975, Gulf was a Pennsylvania corporation with its principal office in Pittsburgh,[1] filing federal corporate income tax returns with the Internal Revenue Service in Philadelphia, Pennsylvania. During 1974 and 1975, Gulf and certain of its subsidiaries constituted an "affiliated group" as that term is defined in I.R.C. § 1504.[2] As the common parent, Gulf timely filed consolidated federal income tax returns for these tax years on behalf of itself and certain of its subsidiaries. We refer to this affiliated group variously as "Gulf" or as "the taxpayer."

The Commissioner determined federal income tax deficiencies of $80,813,428 and $166,316,320 for Gulf's tax years 1974 and 1975, respectively. Gulf challenged these deficiencies in the U.S. Tax Court, alleging numerous erroneous rulings by the Commissioner. Due to their complex and diverse nature, certain issues were severed and tried at a special trial session, resulting in seven Tax Court opinions, four of which are involved in this appeal.

The first issue, referred to by the parties as the "Worthless Properties" issue, involves the question of whether Gulf could take abandonment loss deductions pursuant to I.R.C. § 165 on geological strata which were found to be devoid of mineral deposits and, hence, were deemed worthless by the taxpayer, even though the entire lease was not abandoned. Gulf appeals from the Tax Court's determination that there was no abandonment.

The second dispute, referred to as the "Kuwait Nationalization" issue, presents several questions, the foremost of which is whether the value of the price discount

---

* Honorable Anne E. Thompson of the United States District Court for the District of New Jersey, sitting by designation.

1. Gulf Oil Corporation is now known as Chevron U.S.A. Inc.

2. Except as noted, all statutory references are to the Internal Revenue Code of 1954 (26 U.S.C.) as amended and in effect during tax years 1974 and 1975.

under a five year crude oil supply agreement is ordinary income to the taxpayer or whether it was compensation by Kuwait for its nationalization of the taxpayer's interests and, hence, a capital gain. Gulf appeals from the Tax Court's determination that the price discount was not compensation for nationalization. The Commissioner appeals from the Tax Court's determination that the taxpayer could accrue and deduct, in tax year 1975, Kuwait income taxes related to the prospective five year crude oil supply agreement.

The third problem, referred to as the "Captive Insurance" issue, presents cross-appeals by Gulf and by the Commissioner concerning the Tax Court's determination that the premiums paid by the taxpayer to its subsidiary insurance company were not deductible expenses and that the payments on losses by the subsidiary insurance company to other subsidiaries owned by Gulf were not constructive dividends to the parent corporation.

Finally, in the section referred to as the "Iran Agreement," upon the Commissioner's appeal, we must determine whether the Tax Court erred by concluding that Gulf possessed an economic interest in minerals in place pursuant to a 1973 Agreement. The Tax Court determined that the taxpayer possessed an economic interest and, therefore, was permitted to take a depletion allowance deduction for tax year 1974 and was further permitted to have a foreign tax credit for taxes paid to Iran.

▆▆▆▆ We will address these issues seriatim, keeping in mind our scope of review. We exercise plenary review of the Tax Court's construction and application of the Internal Revenue Code. *Pleasant Summit Land Corp. v. Comm'r*, 863 F.2d 263, 268 (3d Cir.1988). With respect to disputes of fact, we may reverse the Tax Court's decision only if the findings are clearly erroneous. A finding is clearly erroneous when "there is evidence to support it, [but] the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Double H Plastics, Inc. v. Sonoco Prods. Co.*, 732 F.2d 351, 354 (3d Cir.1984). We are quite aware that we cannot reverse findings of fact simply because we would have decided the case differently. *Anderson v. Bessemer City*, 470 U.S. at 573, 105 S.Ct. at 1511. Our jurisdiction rests on 26 U.S.C. § 7482(a): United States Courts of Appeals have exclusive jurisdiction to review Tax Court decisions.

Under the appropriate standard of review for each issue, we are affirming in part and reversing in part the decisions of the U.S. Tax Court. Our reversing in part requires recomputation of Gulf's tax liability for these tax years. Thus, we will remand for a recomputation of Gulf Oil Corporation's 1974 and 1975 tax liability consistent with this opinion.

## I. WORTHLESS PROPERTIES

On this first issue relating to Gulf's offshore oil and gas leases, Gulf presents two questions: (1) whether Gulf had "abandoned," as a matter of law, particular offshore leases in tax years 1974 and 1975, which would entitle it to an I.R.C. § 165 loss deduction; and (2) if the deduction were permitted, the appropriate calculation of the amount of Gulf's basis in each lease which would properly be allocated to the worthless operating minerals interests. We will affirm the Tax Court's decision, reported at *Gulf Oil Corp. v. Comm'r*, 87 T.C. 135 (1986), that Gulf failed to prove abandonment of the leases involved.

### A. Facts

During tax years 1974 and 1975, Gulf held undivided interests in twenty-three offshore oil and gas leases in the Gulf of Mexico, covering blocks located in the offshore areas of Louisiana and Mississippi, Alabama, and Florida (MAFLA).[3] The lessor for one lease, in offshore Louisiana, was the State of Louisiana (the Louisiana

---

**3.** Gulf acquired interests ranging from 33⅓% to 70% in ten offshore Louisiana leases in 1972–74, and from 33⅓% to 100% in thirteen offshore MAFLA leases in 1974.

lease). The U.S. Department of Interior [4] was the lessor for the other twenty-two leases (the Department leases). Gulf based its bids for these leases on its perception of the value of the underlying minerals. The bids reflected basic geologic evaluations which were used to estimate the amount of oil and gas present in each block of land to be leased.[5] These were balanced against the potential costs of placing the lease into production. From this, Gulf would calculate a geological assessment of risk, the most important factor in determining how much to bid.

Successful lease bidders were required to pay the lessor an up-front cash bonus for each lease. For the leases at issue, Gulf and its co-lessees paid cash bonuses ranging from $1.127 to $61.166 million per lease ($15 million average).[6] In addition, lessees were also required to pay a yearly delay rental on each lease to ensure lease retention throughout the primary term, permitting lessees to complete exploration. Delay rentals on the Department leases were $3.00 per acre;[7] thus, to retain rights in twenty-two of the leases, Gulf and its co-lessees would be required to pay approximately $20,000 per lease per year. Delay rentals on the Louisiana lease were one-half of the cash bonus payment for each lease. Since the total cash bonus payment on this lease was $7.713 million, Gulf and its co-lessees would be required to pay approximately $3,856,600 per year to retain rights in this lease.

Lessees could relinquish rights to the Department leases in three ways. First, since the primary term of each lease was five years from the effective date of the lease, each lease would expire automatically by operation of law at the end of its five-year primary term, unless the lease was extended by either production in paying quantities or continuation of drilling. Second, the lessee could elect not to pay the required annual delay rental on the lease. Third, the U.S. Department of Interior, pursuant to its regulations, would accept a release or relinquishment of either an entire offshore lease or an "officially designated subdivision" thereof. However, per regulations in effect since 1954, the Department would not accept relinquishment of horizontal intervals, strata, or sands in an offshore lease. Once the lessee relinquished rights in a lease, the lease became available for bid at a subsequent lease sale.

Gulf acquired undivided interests in these twenty-three offshore oil and gas leases from 1972 through 1974. Shortly after acquiring these interests, Gulf personnel determined how many geological strata, i.e., horizontal layers, underlying each lease might contain gas or oil deposits. Determinations were based upon the known geology of other nearby parcels. Gulf personnel determined that each of the ten offshore Louisiana leases potentially contained between six and thirty-nine deposits, and that each of the thirteen offshore MAFLA leases potentially contained between three and eight deposits. Gulf then allocated its total basis in each lease, consisting of the initial cash bonus payment plus any geological and geophysical costs, among the strata believed to contain oil and gas deposits.[8] Pursuant to I.R.C. § 614(b)(2), Gulf made an election to treat

---

4. The Minerals Management Service administers the grant, development, operation, and surrender of oil and gas leases by the United States.

5. By 1972, petroleum companies, such as Gulf, had extensively explored, discovered and developed the offshore Louisiana area. Thus, bidders on new leases had production history and geologic control data available to them in determining the amount they would bid. However, immediately prior to the taxable years in issue, offshore MAFLA was not a developed area. Hence, no production or geologic control data were available.

6. Gulf's share of each cash bonus payment was based on its undivided percentage interest in each lease.

7. Each lease (including the lease from the State of Louisiana) covered an area of between 5,000 and 5,760 acres.

8. For the offshore Louisiana leases, Gulf allocated its basis equally among the strata believed to contain oil and gas. For the offshore MAFLA leases, Gulf allocated its basis among the potential mineral-containing strata in proportion to each stratum's estimated value relative to the other strata in that lease.

each potential mineral deposit (horizontal strata) in each lease as a separate property.[9] Gulf's tax department initiated the process establishing its separate property procedures in the Gulf of Mexico. For a valid I.R.C. § 614(b)(2) election, more than one operating mineral interest must exist in a single tract or parcel of land.

During or prior to the tax years in issue, wells were drilled on the leases in question. As a consequence of unsuccessful drilling operations, Gulf determined that some of the potentially productive strata underlying each lease did not contain any oil or gas deposits or commercial quantities of oil and gas. Therefore, Gulf viewed these strata as worthless. Nonetheless, Gulf continued to retain all its rights to the leases and continued to pay the yearly delay rentals on the Department leases to protect its interests in the strata not deemed worthless. Also, Gulf farmed out limited rights in two of the leases, retaining its interest in the depth intervals farmed out and paying a portion of the development costs of subsequently discovered mineral deposits in farmed-out strata. Gulf even claimed production from a deposit in one strata it earlier asserted that it abandoned.

Presuming its I.R.C. § 614(b)(2) election was enforceable, Gulf claimed section 165 abandonment loss deductions on its 1974 and 1975 consolidated federal corporate income tax returns of $35,561,455 and $108,108,366, respectively. These loss deductions were based on "abandonments and extraordinary retirements" of the potential mineral deposits within certain of the offshore leases which Gulf had elected to treat as separate properties and which it now considered worthless. The Commissioner fully disallowed the deductions, determining that Gulf had not established the worthlessness of the mineral interests. The Tax Court agreed with the Commissioner, holding that Gulf failed to prove any act evidencing its present declaration that these properties were worthless and abandoned in tax years 1974 and 1975, whether the property is defined as each of

the potential mineral deposits or as the lease itself. Thus, the Tax Court found it unnecessary to decide whether each potentially productive stratum could properly be treated as a separate property under I.R.C. § 614(b)(2). Gulf appeals from this decision.

## B. *Abandonment*

■ Gulf contends that the Tax Court committed three legal errors: (1) denying the deduction without deciding whether Gulf's potential mineral deposits in each lease qualified as operating mineral interests eligible to be treated as separate properties by way of an election under I.R.C. § 614(b)(2); (2) implicitly concluding that the property at issue is the lease itself and not the prospective mineral deposits; and (3) determining the availability of a loss deduction under I.R.C. § 165 solely on the basis of whether Gulf disposed of legal title to its allegedly worthless operating mineral interests during the tax years in issue.

Gulf argues that the legal question of whether an I.R.C. § 165 deduction is available cannot be addressed unless the scope of the property in question is defined. Gulf asserts that the property in question is the potential mineral deposits or each horizontal stratum within the leases, and not the entire lease itself, because the potential mineral deposits within each lease are operating mineral interests and, therefore, separate properties as a result of Gulf's I.R.C. § 614(b)(2) election. Hence, Gulf contends, each potential mineral deposit in each lease is a separate property which could be abandoned for purposes of a loss deduction pursuant to I.R.C. § 165.

The Commissioner counters that the Tax Court was not required to decide whether the taxpayer was entitled to treat the potentially productive strata underlying the leases as separate properties since, in any event, the taxpayer failed to show abandonment. The Commissioner also argues that, even if the Tax Court should have deter-

---

**9.** The facts are unclear as to which year Gulf made this separate property election. We note only that the parties stipulated that Gulf made

the election and the Tax Court ruled that the election was timely made.

mined the nature of the property in question, the taxpayer was not entitled to treat the horizontal strata as separate properties.

Under I.R.C. § 165, a taxpayer may take a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. I.R.C. § 165(a). A loss deduction is permitted under I.R.C. § 165 only for a taxable year in which the loss is sustained, as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. Treas.Reg. § 1.165–1(d)(1). Similarly, a loss deduction is allowed for obsolescence of nondepreciable property, such as an oil lease, where a loss is incurred arising from the sudden termination of the property's usefulness in that business or transaction. The termination can occur, for example, when the business or transaction is discontinued, or when property is permanently discarded from use. Treas.Reg. § 1.165–2(a). For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs. *Id.*

I.R.C. § 165 losses have been referred to as abandonment losses to reflect that some act is required which evidences an intent to discard or discontinue use permanently. *A. J. Industries, Inc. v. United States*, 503 F.2d 660 (9th Cir.1974). "[I]n order for a loss of an intangible asset to be sustained and to be deductible, there must be (1) an intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment." 503 F.2d at 670. Moreover, "mere intention alone to abandon is not, nor is non-use alone, sufficient to accomplish abandonment." *Id., citing Beus v. Comm'r*, 261 F.2d 176, 180 (9th Cir. 1958).

Gulf failed to establish that it had taken any affirmative act manifesting its abandonment of the Department property, and, indeed, conceded (*see Gulf Oil*, 87 T.C. at 163), that none of the *leases* themselves had been abandoned during the tax years

at issue. Gulf can demonstrate no act, such as relinquishment of the lease or nonpayment of delay rentals,[10] which would support its claim of abandonment. Indeed it preserves the right to drill, explore and produce from these strata. Merely abandoning the strata or leases on paper because they are deemed worthless is insufficient to demonstrate abandonment for purposes of an I.R.C. § 165 loss deduction. *See Beus*, 261 F.2d at 180.

The absence of any act manifesting Gulf's intention to abandon is a finding of fact. We have examined the record and conclude that the Tax Court's finding was not clearly erroneous. Thus no error of law in applying section 165 to these facts occurred.

No deductions for abandonment loss may be taken with respect to the leases, again a mixed question of law and fact, based upon the absence of an affirmative act of Gulf's intention to abandon.

Just as the Tax Court did not feel compelled to reach the question of whether individual strata could be treated as separate properties under section 614(b)(2), we, too, do not comment on it. We leave that difficult question for future resolution when the facts more closely depict abandonment.

## C. *Conclusion*

We hold that the Tax Court properly concluded that Gulf had failed to prove abandonment, whether the property is understood as separate strata or as the entire lease, and hence was not entitled to the deductions under I.R.C. § 165. We will therefore affirm the Tax Court's decision.

## II. KUWAIT NATIONALIZATION

The issues presented in these cross-appeals arise from events occurring during the 1975 nationalization of the Kuwaiti Government's oil resources. Specifically, Gulf challenges the Commissioner's finding and the Tax Court's decision that the value of a price discount given to Gulf by Kuwait

---

**10.** We note that Gulf alleges that it did not pay the delay rental on the Louisiana lease for 1975; however, relinquishment of the lease was not executed until June 21, 1976.

in a five-year crude oil supply agreement is properly categorized as ordinary income rather than as additional compensation for the Kuwait Concession nationalization, which would qualify the transaction for preferred capital gains tax treatment under I.R.C. § 1231. The Commissioner appeals the Tax Court's determinations that the present value of this price discount is properly accrued and reported in tax year 1975 under I.R.C. § 451 rather than reported in each of the five years of the agreement, and that the Kuwaiti income taxes on this price discount are properly accrued and deducted in tax year 1975.

We will affirm that part of the Tax Court's decision holding that the price discount is not compensation for the Kuwait Concession nationalization since this finding of fact is not clearly erroneous. Therefore, the Kuwaiti income taxes related to the price discount constitute a deduction under I.R.C. § 164 rather than a foreign tax credit under I.R.C. § 901. We will reverse the Tax Court's decision that the present value of the price discount is properly accrued and reported in tax year 1975 because the record demonstrates that all of the events fixing the right to receive the income had not occurred. Consequently, the income taxes related to the price discount cannot be accrued and deducted in tax year 1975.

### A. *Facts*

We begin with the facts, not generally in dispute, as set forth by the Tax Court in its opinion, *Gulf Oil Corp. v. Comm'r*, 86 T.C. 937 (1986). The Middle Eastern country of Kuwait first granted operational rights to Gulf Oil Corporation in 1934. In 1951, however, Gulf's interest was redefined in a document known as the 1951 Concession Agreement.[11] In this agreement, Gulf was granted rights to one-half of the Kuwait Concession while BP Kuwait Ltd., a subsidiary of the British Petroleum Co. Ltd., obtained rights to the other half. Gulf's stake in the Kuwait Concession was one of its most valuable holdings in the Middle East oil area from the time of the grant until completion of the 1975 nationalization. During this time, Gulf established its customer base and built production facilities dependent on Kuwaiti crude oil.

In 1972, oil prices increased dramatically as a result of disruptions in the flow of Middle East oil.[12] During this unstable period, oil producing governments began nationalizing in order to exert pressure to increase their participation in the oil concessions. OPEC's stated policy concerning compensation, by which all members were to comply, was that members should pay the oil companies only the book value for physical assets. Nothing should be paid for the value of the minerals in place since oil in place was deemed to be owned by each member's government.

Through the 1973 General Agreement,[13] an imposed non-negotiated agreement, Kuwait acquired 25 percent interest in the Kuwait Concession and related assets in Kuwait with the option to obtain up to 50 percent of the Kuwait Concession and related assets by 1982.[14] However, through the 1974 Concession Agreement,[15] Kuwait increased its Concession ownership to 60 percent by formation of Kuwait Oil Co., a Kuwaiti corporation, owned 60 percent by Kuwait, 20 percent by BP Kuwait and 20 percent by Gulf Kuwait. The agreement also stated that the affiliation between Kuwait, Gulf Kuwait and BP Kuwait should be reevaluated prior to 1979. As consideration for each of the 1973 and 1974 agreements, Kuwait complied with OPEC policy, paying only the book value of the appropri-

---

**11.** This agreement, confirmed by later agreements, established that the Kuwait Concession was to run to the year 2026.

**12.** These disruptions resulted from factors such as the formation of OPEC, the Yom Kippur War, and the Arab Boycott.

**13.** The parties to this agreement were Kuwait, BP, BP Kuwait, Gulf, and Gulf Kuwait.

**14.** The Agreement anticipated an increase by 5 percent increments in Kuwait's ownership of the Kuwait Concession until it achieved the 50% interest.

**15.** Parties to this agreement were Kuwait, BP Kuwait and Gulf Kuwait.

ate proportionate share of the physical assets related to the Concession.

On March 5, 1975, the Kuwaiti Minister of Oil [16] announced Kuwait's intent to nationalize the remaining 40 percent of the Concession.[17] In response, Gulf began to negotiate with the Kuwaiti Government to obtain as good an overall package as possible for relinquishing its entire interest in the Kuwait Concession. At a March 29, 1975 meeting, the Kuwaiti Prime Minister assured Gulf that the government did not intend to force the oil companies out of Kuwait, stating that Kuwait needed the oil companies and respected their past contributions to the country. Gulf "attributed great significance to the Prime Minister's words since they indicated that a negotiated settlement between the Kuwaiti Government and the [oil] companies was possible." *Gulf Oil Corp.*, 86 T.C. at 943. After the initial meetings in late March, Gulf and BP continued to negotiate with the Kuwaiti Government, attempting to conclude a settlement acceptable to all parties. Kuwait's initial and final position was that the only compensation to be paid to Gulf and BP for the nationalization was $25,250,000 each, representing the net book value of the physical assets, in accord with the OPEC formula. Gulf countered that it had to be reimbursed on the basis of an overall package furnishing not only cash payment for its physical holdings, but also a sufficient economic benefit representing the loss of expected profits from its Kuwait Concession interest. Gulf was reluctant to surrender its rights in the Kuwait Concession for payment based exclusively on the OPEC formula.

Nonetheless, the final 1975 Nationalization Agreement specified that Gulf Kuwait and BP Kuwait would each be paid $25,250,000. The parties executed the agreement on December 1, 1975; the agreement was ratified by the Kuwaiti National Assembly on March 18, 1976. Additional agreements not subject to ratification (including the Crude Oil Supply Agreement at issue in this case) were effected contemporaneously with the Nationalization Agreement on December 1, 1975. None of the executed documents included any manifestation that Kuwait intended the additional commercial arrangements to be compensation for the Kuwait Concession nationalization.[18]

The primary additional agreement was the Crude Oil Supply Agreement,[19] which covered six items. The first and most detailed item covered Gulf's agreement "to purchase 650,000 barrels per day of Kuwaiti crude oil from April 1 through December 31, 1975, and 500,000 barrels per day" from January 1, 1976 through March 31, 1980.[20] 86 T.C. at 945. The price per barrel was the price initiated by the Kuwaiti Government for sale to usual purchasers, less "a sum which after the deduction of Kuwaiti

---

**16.** Until January, 1975, control over oil policy had previously been vested in the Minister of Finance.

**17.** Since Gulf and BP (through Gulf Kuwait and BP Kuwait) were the only Concession holders for the onshore Kuwait area, no other oil companies were involved in the 1975 nationalization.

**18.** The Tax Court found that Gulf would have preferred either that the items in these agreements be "included in a single comprehensive document subject to approval by the National Assembly, or that the Nationalization Agreement and additional agreement explicitly cross-reference each other." 86 T.C. at 945. Kuwait, however, was reluctant to accede to either suggestion.

**19.** This agreement was executed on December 1, 1975. The formal supply contract anticipated by this agreement was executed on March 24, 1976. The contract terms were in accord with those specified in the agreement.

**20.** The remaining five items in the Crude Oil Supply Agreement were as follows: (1) Gulf and Kuwait were to discuss commercial petroleum products sales; (2) Gulf agreed to purchase a set amount of bunker fuel during the term of the supply agreement; (3) Gulf was to charter three Kuwaiti tanker vessels for so long as the supply contract and succeeding agreement were in effect; (4) Gulf was to furnish appropriate experienced personnel to support Kuwait Oil Co.'s operations and any other Kuwaiti government entity engaged in oil operations; and (5) Gulf and Kuwait assented to pursue shared commercial investment ventures. These five points were outlined in approximately one paragraph, with arrangement for the execution of business terms and formal contracts to occur at a later date.

Income Tax payable with respect thereto shall be 15 U.S. cents per barrel." *Id.* Gulf was required to market the acquired oil in Kuwait at the pre-discounted price. The Crude Oil Supply Agreement contemplated that a binding contract with more definite terms would be executed shortly, indicating that the foregoing "terms would be treated as a binding contract until the formal contract was executed." *Id.*

The Kuwaiti government alluded to all the agreements—other than the Nationalization Agreement—as commercial arrangements and not as recompense for the nationalization of the Kuwait Concession. Kuwait's unfailing public and private posture was that the discount had been given to Gulf because Gulf was such a large buyer of Kuwaiti crude oil. Although no other major buyer of Kuwaiti oil, other than BP, acquired a discount during 1974 and 1975, Royal Dutch Shell was benefitting from favorable credit terms. Gulf objected to the advantageous terms offered to Shell since it deflated the discount Gulf received. After the Nationalization Agreement was executed, Gulf was advised that Shell's contract was altered to eliminate the favorable credit terms.

As an accrual method taxpayer using the calendar year as its tax year, Gulf is required to report recognized accrued gains

and losses each calendar year.[21] Thus, on its 1975 consolidated federal corporate income tax return, Gulf reported a total I.R.C. § 1231 capital gain of $276,517,903 related to the Kuwait Concession nationalization, and a foreign tax credit of $315,674,245 for Kuwaiti foreign income taxes paid or accrued.

Of the reported capital gain amount, $1,117,956 represented the difference between Kuwait's stated cash payment to Gulf for physical assets in Kuwait as nationalization proceeds ($25,250,000), and Gulf's adjusted basis in those assets for tax purposes ($24,132,044).[22] The $275,399,947 balance represented the present value of the discount Gulf was to receive over the five-year term of the Crude Oil Supply Agreement, which Gulf asserts was also part of the nationalization proceeds. The Commissioner disagreed that the nationalization proceeds included the crude oil discount. Thus, the Commissioner fully disallowed the reported I.R.C. § 1231 capital gain, allowed a loss under I.R.C. § 1231 of $133,638, and determined that Gulf realized ordinary income of $952,469[23] under the nationalization agreement. Before the Tax Court, the Commissioner also asserted alternatively that, if the discount were part of the nationalization proceeds, a discount

21. An accrual method taxpayer recognizes a realized gain or loss in the tax year when (1) all events have occurred that fix the right to receive payment from the sale or other disposition of property, and (2) the amount can be determined with reasonable accuracy. Treas.Reg. § 1.451–1(a). A realized gain or loss is generally defined as the difference between the amount the taxpayer realizes on the sale or other disposition of property and the adjusted basis of that property. I.R.C. §§ 1001(a), (c). Adjusted basis is defined as basis adjusted as provided under I.R.C. § 1016 [e.g., expenditures chargeable to capital account, exhaustion, obsolescence, amortization]. I.R.C. § 1011(a). A taxpayer's realized amount is the sum of any money received plus the fair market value of any property (other than money) received. I.R.C. § 1001(b).

22. Both parties agree that Gulf realized compensation of $25,250,000 under the 1975 Nationalization Agreement, representing Kuwait's stated cash payment for the physical assets, resulting in a realized gain of $1,117,956. Since this agreement was executed on December 1, 1975, this realized gain is also recognized in tax year

1975. During the tax years involved in this case, capital gains were given preferential tax treatment under the Internal Revenue Code. A "§ 1231 capital gain" is any recognized gain (1) from the sale or exchange of property used in the trade or business, and (2) from the compulsory or involuntary conversion into other property or money of (a) property used in the trade or business, or (b) any capital asset held for more than six months in connection with a trade or business or a transaction entered into for profit. I.R.C. § 1231(a)(3)(A). For purposes of I.R.C. § 1231, "property used in the trade or business" means real property or property of a character subject to I.R.C. § 167 depreciation allowance, used in the trade or business, and held for more than six months. I.R.C. § 1231(b)(1). Neither party disputes that the $1,117,956 realized, recognized gain is a capital gain under I.R.C. § 1231 which qualifies for preferential tax treatment.

23. The Commissioner gave no explanation for this ordinary income determination.

on future purchases had no discernable fair market value in 1975. Thus, no gain could be accrued and reported in 1975. Although the Tax Court held that the present value of the discount was properly accrued and reported in 1975 since the amount could be ascertained with reasonable accuracy in 1975, the court determined that the value of the discount was not part of the nationalization proceeds; therefore, the accrued amount must be recognized as ordinary income and not as § 1231 capital gain.

Of the reported foreign tax credit amount, $151,469,970 related to tax accrued on the crude oil discount included as nationalization proceeds.[24] The Commissioner disallowed this credit because (except for taxes accrued before the March 5, 1975 nationalization date and limited by I.R.C. § 907) it did not represent a creditable tax under I.R.C. § 901. Thus, the Commissioner allowed a foreign tax credit of $94,763,164 [25] for Kuwaiti income tax accrued or paid before March 5, 1975. For the period March 5 through December 31, 1975, the Commissioner determined that the accrued Kuwaiti foreign income tax was not an allowable foreign tax credit,[26] but allowed a $36,209,447 deduction (rather than a credit). For the period beyond December 31, 1975, the Commissioner disallowed any credit or deduction for tax allegedly accrued. Although the Tax Court agreed that the income tax related to the discount was a deduction and not a foreign tax credit, the court held that the tax was a properly accrued and reported deduction in 1975 since the amount could be calculated with reasonable accuracy by mere mathematical extrapolations from the present value of the discount.

We turn first to the threshold issue of whether or not the Crude Oil Supply Agreement's price discount is compensation for the Kuwait Concession nationalization, a question of fact from which Gulf's tax implications are twofold. If the discount is not considered as nationalization compensation, Gulf will not receive the benefit of preferred capital gains tax treatment on the income from the discount. Second, Gulf will not receive the benefit of a foreign tax credit for the Kuwaiti income taxes due related to the Crude Oil Supply Agreement; rather, those income taxes will have to be reported on its tax return as a deduction. We will then address the final issue of whether the Tax Court correctly permitted Gulf to accrue in 1975 the five-year taxes, a matter invoking our plenary review since it involves construction of the Internal Revenue Code.

B. *The Nationalization and Crude Oil Supply Agreements*

■ Gulf argues that the Tax Court's holding that the discount did not constitute nationalization compensation is clearly erroneous because the "overwhelming evidence presented ... clearly establishes that ... the Crude Oil Supply Agreement [discount] constituted the major part of the consideration [Gulf received] for the 1975 nationalization of its remaining 20 percent interest in the Kuwait Concession." Gulf urges us to review the totality of the circumstances rather than the Kuwait Government's public declarations, chiefly, that Gulf and Kuwait engaged in lengthy negotiations throughout most of 1975, attempting to conclude a mutually satisfactory settlement for the nationalization.[27] Gulf and BP rejected two Kuwaiti counter-

---

24. This figure, computed by multiplying the present value of the discount ($275,399,947) by the Kuwait tax rate, 55 percent, represents the Kuwaiti income tax Gulf would be required to pay over the five-year term of the oil supply contract.

25. Actual accrued Kuwaiti income taxes for January 1 through March 4, 1975 was $142,748,973. This amount was reduced by an adjustment under I.R.C. § 907(a) of $47,985,809, resulting in the allowable $94,763,164 credit.

26. After adjustments under I.R.C. § 907(a), this determination resulted in a net foreign tax credit disallowance of $220,911,081.

27. Gulf asserts that the 1975 negotiations differed significantly from those surrounding the 1973 and 1974 partial nationalizations, both of which were concluded with minimal negotiations and with little resistance from Gulf since it continued to retain an interest in the concession.

proposals as economically inadequate before finally accepting the official one. Gulf asserts that at all times during negotiations, it considered the discount as nationalization compensation; in fact, both parties treated the discount as compensation during the nationalization negotiations. Indeed, the Kuwait Minister of Oil advised that Gulf and BP deserved some "special consideration" for past contributions to Kuwait, and that "some discount should be given to them to repay them for their contributions."

Gulf urges us to consider that the nationalization documents are contemporaneous and interrelated[28] in such a way that the owners of the Kuwait Concession received a discount on crude oil while others did not. Gulf Kuwait and BP Kuwait, as owners of the Kuwait Concession, were the only large purchasers who obtained the right to purchase crude oil at a discount. Kuwait unilaterally terminated Royal Dutch Shell's favorable credit terms in direct response to Gulf's objection that any such benefit would reduce the value of Gulf's crude oil discount as compensation. Kuwait wanted to justify publicly the discount given to Gulf. The discount was not a mere commercial arrangement given to Gulf in exchange for a package of separate items, since these items involved future commercial arrangements to be negotiated at arm's length.

While the evidence presented could be viewed as supporting Gulf's argument that the discount constituted nationalization compensation, we cannot reverse the Tax Court on this issue unless the Tax Court determination was clearly erroneous, since the intent of the parties is a question of fact which must be determined by the factfinder. To interpret contracts with

some consistency and to provide contracting parties with a legal framework with a measure of predictability, courts must bind parties by the objective manifestations of their intent rather than by ascertaining subjective intent. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980). Moreover, we have said: "The subjective meaning attached by either party to a form of words is not controlling on the scope of the agreement between the parties unless one party knows or has reason to know of a particular meaning attached by the party manifesting assent." *Brokers Title Co. v. St. Paul F. & M. Ins. Co.,* 610 F.2d 1174, 1184 (3d Cir.1979), *citing* Restatement (Second) Contracts § 226, Comment b.

Although the Tax Court agreed that Gulf intended to negotiate for as good an overall package with Kuwait as possible in connection with the Kuwait Concession relinquishment, the court found that Kuwait did not intend at any time to pay any more as nationalization compensation than the amount set under the OPEC formula. Although the two agreements were signed on the same date, the Tax Court concluded that the documents served separate purposes: the Nationalization Agreement nationalized the Kuwait Concession; the Crude Oil Supply Agreement set forth guidelines for future commercial arrangements. The Tax Court was not convinced that the two documents were sufficiently interrelated to warrant a conclusion that the discount was additional nationalization compensation. The court found that the objective facts were far more consistent with the official Kuwaiti position than with the characterization urged by Gulf. In arriving at its decision, the court stated that Gulf's position was supported by no more

---

**28.** Under Article 4 of the Nationalization Agreement, it was agreed that the parties would enter into arrangements concerning the commercial supply of crude oil to Gulf and BP.

The Government and the Companies agree to enter into arrangements concerning the commercial supply to the Companies of Kuwait Crude Oil and matters related thereto.

The preamble to the Crude Oil Supply Agreement refers specifically to Article 4 of the Nationalization Agreement.

This Agreement made in Kuwait the 24th day of March, 1976, by and between the Ministry of Oil of the Government of Kuwait, represented by the Minister of Oil (herein referred to as "SELLERS") and Gulf Kuwait Company (herein referred to as "BUYERS"). This Agreement refers to the agreement dated December 1, 1975, made between said Government on the first part and BP (Kuwait) Limited and BUYERS on the second part and its associated agreements of same date.

than the statements of Gulf's employees as to the goals that it wished to achieve in the negotiations.

After our review, we are not left with the definite and firm conviction that the Tax Court erred. Therefore, we cannot hold that the Tax Court's findings are clearly erroneous. We will affirm the Tax Court's decision that the discount from the Crude Oil Supply Agreement was not compensation for the 1975 nationalization of the Kuwait Concession.

## C. *Kuwait Income Taxes*

■ Section 901(a) of the Internal Revenue Code provides a credit for income taxes paid, or accrued during the taxable year, to any foreign country or United States possession. I.R.C. § 901(b)(1). Income taxes paid or accrued during the taxable year to any foreign country *in connection with the purchase and sale of oil and gas extracted in that country*, however, are not considered taxes for purposes of I.R.C. § 901 if (1) the taxpayer has no economic interest in the oil or gas to which I.R.C. § 611(a) applies and (2) the purchase or sale is at a price which differs from the fair market value for the oil or gas at the time of purchase or sale. I.R.C. § 901(f). Since we affirmed the Tax Court's decision that the crude oil supply discount was not additional nationalization compensation, it follows that the Kuwaiti income taxes are subject to the § 901(f) test.

Gulf conceded before the Tax Court that it did not have an economic interest in the minerals in place in Kuwait after March 5, 1975 (the nationalization effective date). Furthermore, Gulf presented no evidence that the pre-discount price set by contract as the purchase and sales price for the oil was equal to fair market value. Since the I.R.C. § 901(f) requirements are met, the Kuwaiti income taxes do not qualify as a foreign tax credit under I.R.C. § 901; rather, these taxes qualify as a deduction under I.R.C. § 164, which allows deductions for foreign taxes paid or accrued. The Tax Court did not commit an error of law in applying § 901 and, therefore, we will affirm the Tax Court in this regard; how-

ever, we disagree that the taxes can be accrued in tax year 1975.

## D. *Tax Year 1975*

■ With respect to the amount of the deduction to be taken in tax year 1975, the Tax Court concluded that the present value of the income from the five-year discount was properly accrued (but, as ordinary income) in 1975 because, under the terms of the Crude Oil Supply Agreement, Gulf was to purchase a specific amount (750,000 barrels per day for five years) at a constant discount ($0.15 per barrel). Therefore, computing the present value of the discount required no more than applying the contractual terms to the extrapolation from figures available in 1975. Moreover, the court found that accrual was proper in tax year 1975 because, by its terms and as manifested by the parties' actions, the 1975 Crude Oil Supply Agreement was a binding contract, not subject to ratification by Kuwaiti officials, until the actual Crude Oil Supply Contract was executed in 1976. The court also concluded that the Kuwaiti income taxes related to the discount were properly accrued since they, too, could be calculated with reasonable accuracy in 1975. Neither party disputes the fact that accrual, in 1975, of the Kuwaiti income taxes payable on the Crude Oil Supply Agreement discount depends entirely on whether or not the corresponding income from that discount can be accrued and reported in 1975.

■ We disagree with the Tax Court's holding that the value of the discount and the corresponding Kuwaiti taxes can be accrued in tax year 1975. For an accrual method taxpayer, income is includible in gross income when (1) all the events have occurred so that the right to receive the income is fixed; and (2) the amount of the income can be determined with reasonable accuracy. Treas.Reg. § 1.451–1(a). Income is accruable in the year the taxpayer's right to receive that income becomes fixed and definite, even though it may not actually be received until a later year. *Comm'r v. Blaine, Mackay, Lee Co.*, 141 F.2d 201, 203 (3d Cir.1944); *see also Frei-*

*hofer Baking Co. v. Comm'r,* 151 F.2d 383, 385 (3d Cir.1945), *Comm'r v. Security Flour Mills Co.,* 135 F.2d 165, 167 (10th Cir.1943), *affirmed,* 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725 (1944). An expense is deductible for the tax year in which (1) all the events have occurred which determine the fact of the liability; and (2) the amount thereof can be determined with reasonable accuracy. Treas.Reg. § 1.461–1(a)(2). An expense is accruable in the year the liability becomes fixed and certain, even though it may not be paid until a later year. *Blaine, Mackay, Lee Co.,* 141 F.2d at 203; *see also Freihofer Baking Co. v. Comm'r,* 151 F.2d 383, 385 (3d Cir.1943), *Comm'r v. Security Flour Mills Co.,* 135 F.2d 165, 167 (10th Cir.1943). "To satisfy the all-events test, a liability must be 'final and definite in amount,' *Security Flour Mills Co. v. Comm'r,* 321 U.S. 281, 287 [64 S.Ct. 596, 599, 88 L.Ed. 725] (1944), must be 'fixed and absolute,' *Brown v. Helvering,* 291 U.S. 193, 201 [54 S.Ct. 356, 360, 78 L.Ed. 725] (1934), and must be 'unconditional,' *Lucas v. North Texas Lumber Co.,* 281 U.S. 11, 13 [50 S.Ct. 184, 185, 74 L.Ed. 668] (1930)." *United States v. Hughes Properties, Inc.,* 476 U.S. 593, 600, 106 S.Ct. 2092, 2096, 90 L.Ed.2d 569 (1986).

Since we have determined that the Tax Court did not err in ascertaining that the value of the crude oil discount did not constitute nationalization compensation, we must view the Crude Oil Supply Agreement as any other executory contract. Unconditional liability under an executory contract is not created until at least one party performs. *See North Texas Lumber Co.,* 281 U.S. at 13, 50 S.Ct. at 184. Gulf's unconditional liability to pay for the crude oil under the contract does not arise until Kuwait performs by passing title to the crude oil. It is not until Gulf is unconditionally liable to pay for the crude that its right to the income from the discount becomes fixed. During oral argument, Gulf's counsel correctly conceded that, if this discount was not found to be nationalization compensation, the income from the discount is not properly accruable in 1975. In view of the above, we find that the Tax Court erred in holding that both the income from the dis-

count and the corresponding Kuwaiti income taxes payable were properly accrued in 1975.

### E. *Conclusion*

We will affirm the Tax Court's decisions that the price discount is not additional compensation for Kuwait's nationalization of its crude oil resources and that the corresponding Kuwaiti income taxes payable do not constitute a foreign tax credit. We will reverse the Tax Court's holding that both the income from the discount and the corresponding Kuwaiti income taxes payable were properly accrued in 1975.

### III. CAPTIVE INSURANCE

Both parties appeal from the Tax Court's decisions involving payments of insurance premiums by Gulf and its domestic affiliates to Gulf's wholly-owned foreign subsidiary, Insco, in tax years 1974 and 1975. Gulf deducted these insurance premiums as § 162 ordinary and necessary business expenses, but the Commissioner disallowed these deductions and instead determined that both premium payments from Gulf's foreign affiliates and claims paid by Insco to Gulf and its domestic affiliates represented constructive dividends to Gulf. The Tax Court—in a majority opinion and numerous concurring opinions—found that the insurance premiums paid by Gulf and its domestic affiliates that were ceded to Insco were not deductible insurance premiums. The court also held that neither the portions of the insurance premiums paid by Gulf's foreign affiliates that were ceded to Insco nor claims paid by Insco relative to the reinsurance of the risks of Gulf and its domestic affiliates were constructive dividends to Gulf. We will affirm on both issues.

### A. *Facts*

The parties generally stipulated to the operative facts on the issues before the Tax Court, which the court set forth at length in its opinion of *Gulf Oil Corp. v. Comm'r,* 89 T.C. 1010 (1987). We repeat

only those most important to our resolution.

Through the late 1960's, Gulf and its affiliates were able to obtain insurance coverage at acceptable rates from commercial insurers. The general policy of Gulf and its affiliates was to self-insure risks up to $1 million. For those risks in excess of $1 million, including catastrophic risks, *i.e.*, risks in excess of $10 million, Gulf obtained insurance coverage from primary insurance carriers and reinsurers in both the United States and world-wide markets.

Several incidents occurred in the late 1960's [29] which caused commercial insurance carriers to increase the rates charged to the oil industry and either limit or altogether eliminate coverage for certain types of risks. Gulf decided that the higher rates for the coverages made available to it did not adequately reflect its claims history. Therefore, in late 1970, Gulf participated with several other major independent oil companies in the creation of Oil Insurance Ltd. (OIL).[30] Gulf also created Insco, Ltd., its own subsidiary insurance company authorized to conduct general insurance business under the laws of Bermuda.[31] Initial capitalization for Insco was authorized at $10 million. However, Insco originally issued 1,000 shares valued at $1,000 per share, of which only 12% was paid. Marsh & McLennan, Incorporated, an insurance brokerage and consulting firm, agreed to provide Insco with all underwriting and related services.

Generally, Gulf and its affiliates entered into insurance contracts with and paid premiums to third-party commercial carriers.

Although Gulf and its affiliates paid premiums directly to third-party commercial carriers, a significant portion of the primary carrier's exposure was reinsured with Insco.[32] On December 20, 1973, Gulf executed guarantees in favor of American International Group, Inc. (AIG) [33] and of Oil Industry Association that obligated Gulf to indemnify these insurers should Insco be unable to meet its obligations with regard to its reinsured risks. These guarantees were in effect during the tax years at issue.

In 1975, Gulf shifted ownership of Insco to Transocean Gulf Oil Co., a wholly owned Gulf holding company incorporated in Delaware. Insco collected its shares of non-paid-up stock, while Transocean contributed $880,000 in capital. Simultaneously, Insco distributed 9,000 new shares at $1,000 par, which Transocean purchased as fully paid. This increased Insco's paid-in capital to $10 million. Gulf and its affiliates then began to place catastrophic risk coverage directly with Insco which, in turn, reinsured those risks. Gulf also commenced withdrawal from OIL over the minimum five-year period required. Also in 1975, Insco first began insuring risks of unrelated parties. Over subsequent years, Insco increased underwriting risks for unrelated parties and continued to underwrite additional risks of Gulf and its affiliates.

In tax years 1974 and 1975, Gulf reported ordinary and necessary business expense deductions pursuant to I.R.C. § 162 for insurance premiums, which the Commissioner challenged. The Commissioner disallowed $10,285,330 and $10,900,081, re-

**29.** These incidents included a refinery explosion in Louisiana and an oil spill off Santa Barbara, California.

**30.** OIL was formed as a petroleum industry mutual insurance company in 1971 for the purpose of providing catastrophic risk insurance coverage for its member-shareholders.

**31.** Insco was incorporated on November 3, 1971. Gulf's management agreed that Insco would initially insure only certain foreign risks of domestic subsidiaries. Later, Insco was to provide further insurance, including coverage for Gulf's marine fleet and United States situs risks. Gulf contemplated that Insco would

eventually offer insurance coverage to unrelated third parties.

**32.** The primary carriers retained a commission for acting as a fronting or ceding company for Insco.

Insco's assumed risks were limited to $10 million, but did not include the first $1 million of loss, which Gulf and its affiliates self-insured. Insco ceded the portion of the premiums it received attributable to catastrophic risks either to third-party reinsurers or to OIL.

**33.** Primary insurers for a substantial amount of the risks reinsured with Insco.

spectively, representing the amounts of insurance premium payments made by Gulf and its domestic affiliates to primary insurers that the insurers subsequently ceded to Insco. In addition, the Commissioner recharacterized, as constructive dividends, the amounts of insurance premium payments ($4,029,646 and $4,662,192, respectively) made by Gulf's foreign affiliates that were subsequently ceded to Insco. Finally, the Commissioner treated claims paid by Insco in these tax years ($1,001,441 and $3,059,194, respectively), relative to the reinsurance of the risks of Gulf and its domestic affiliates, as constructive dividends directly to Gulf or to Gulf through Transocean. However, the Commissioner also determined that Gulf and its domestic affiliates sustained deductible uninsured losses under I.R.C. § 165 for the same amounts, $1,001,441 and $3,059,194, respectively.

The Tax Court held that the portions of the insurance premiums paid by Gulf and its domestic affiliates that were ceded to Insco were not deductible insurance premiums. Gulf appeals, claiming the Tax Court committed legal error because the court allegedly based the decision on a "substance over form" analysis that ignores the separate existence of Gulf and its affiliates, including Insco.

The Tax Court rejected the Commissioner's position and found that insurance premiums paid by the foreign affiliates could not be considered constructive dividends under the test in *Sammons v. Comm'r*, 472 F.2d 449 (5th Cir.1972), since those payments were for the affiliates' benefit, *i.e.*, providing risk coverage, rather than for a shareholder purpose. In addition, the claims paid by Insco to Gulf and its domestic affiliates were not constructive dividends since the claims were paid in consideration for the premiums paid.

The Commissioner appeals, contending that, under *Helvering v. Le Gierse*, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941), the transaction at issue does not constitute "insurance" for federal tax purposes and must be considered as constructive dividends to Gulf.

**B. *Deductibility of Insurance Premiums Paid to Insurance Subsidiary***

Under I.R.C. § 162(a), insurance premiums are deductible as ordinary and necessary business expenses. The premium is the means by which two unrelated parties measure the cost of the risk-shifting. Whereas insurance premiums are deductible expenses, amounts entered into self-insurance funds are not. *Clougherty Packing Co. v. Comm'r*, 811 F.2d 1297, 1300 (9th Cir.1987). As the Supreme Court stated in *Le Gierse*, both "[h]istorically and commonly insurance involves risk-shifting and risk-distributing." *Le Gierse*, 312 U.S. at 539, 61 S.Ct. at 649. Thus, to be permitted to take an insurance deduction, the relationship between the parties must actually result in a shift of risk. *Id.* at 540–41, 61 S.Ct. at 649–50.

Gulf asserts that it meets this standard because it created a separate legal identity in Insco for risk shifting and, in fact, Insco insured the risks of unrelated parties, evidence of risk distributing. (In tax year 1975, 2 percent of Insco's premium income came from unrelated parties.)

The threshhold question we must address is whether Insco's insurance coverage to Gulf and its affiliates satisfies both the element of risk transfer and that of risk distribution, regardless of whether Insco insured risks of unrelated parties, if Gulf and its affiliates, both domestic and foreign, are each viewed as separate entities. "Where separate agreements are interdependent, they must be considered together so that their overall economic effect can be assessed." *Clougherty Packing Co.*, 811 F.2d at 1301.

In *Moline Properties v. Comm'r*, 319 U.S. 436, 439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499 (1943), the Court held that a corporation must be recognized as a separate taxable entity if that corporation's purpose is the equivalent of a business activity or is followed by the carrying on of a business. The Court of Appeals for the Sixth Circuit relied on this proposition in *Humana Inc. v. Comm'r*, 881 F.2d 247, 252 (6th Cir.1989), when it held that fellow subsidiaries

of a captive insurer, *i.e.* in a brother-sister relationship, could properly deduct insurance premium payments to that insurer.

In *Humana*, the Tax Court expressly recognized the legal, financial and economic substance of insurance provided by a wholly owned insurance subsidiary to its brother-sister affiliates. *Humana Inc. v. Comm'r*, 88 T.C. 197 (1987). Nonetheless, on appeal, the court of appeals suggested that a parent's insured loss paid by the insurance subsidiary would have a dollar-for-dollar impact on the parent's net worth. Although many of the facts in *Humana* are similar to those in this case, critical distinguishing facts exist. In contrast to the facts here, (1) the captive insurer in *Humana* was fully capitalized initially; (2) no agreement ever existed under which Humana, Inc. or any Humana subsidiary would contribute additional capital to the insurer; and (3) Humana, Inc. and the hospital subsidiaries never contributed additional amounts to the insurer nor took any steps to insure the insurer's performance. In contrast, Insco began as an undercapitalized subsidiary and Gulf executed guarantees in effect during the tax years at issue to protect its primary insurers, AIG and OIA, should Insco fail to meet its obligations as reinsurer. It is thus difficult to see that Gulf truly transferred the risk to Insco during the years in question.

We conclude that the Tax Court did not err in finding that the risk was not here appropriately shifted to the insurance subsidiary during 1974 and 1975. Gulf's arguments that it actually paid premiums to Insco, that Insco was required to establish and maintain appropriate reserves and to satisfy other regulatory requirements imposed by Bermuda law, that each insured had rights against Insco under insurance contracts, and that the source for payment of their claims included premiums paid by others and Insco's capital, do not address the crucial question of whether there was transfer of financial risk. *Le Gierse*, 312 U.S. at 540, 61 S.Ct. at 649, *Clougherty Packing Co.*, 811 F.2d at 1300.

Our decision is consistent with previous opinions of the Tax Court. The Tax Court has held that payments to a captive subsidiary, designated as premiums, whether from the parent corporation or from other subsidiaries, did not represent payments for insurance. *See Carnation Co. v. Comm'r*, 71 T.C. 400 (1978), *aff'd*, 640 F.2d 1010 (9th Cir.1981); *Clougherty Packing Co.*, 84 T.C. 948 (1985); *Humana v. Comm'r*, 88 T.C. 197 (1987), *aff'd in part, rev'd in part*, 881 F.2d 247 (6th Cir.1989) (disallowing insurance premium deductions on the parent-subsidiary relationship, allowing brother-sister subsidiary to deduct the insurance premiums). Thus, the Tax Court has plainly held that where the captive was wholly owned by its parent, and the captive insured risks only within the affiliated group, the risk is not truly distributed.

We recognize that with regard to the tax year 1975, the majority of the Tax Court held that the 2% net premiums from unrelated parties was *de minimis* and did not demonstrate the existence of a true transfer of risk. One concurring judge of the Tax Court warns that the court's opinion will create a problem because at some point the majority's analysis will require a line to be drawn as to when third party premiums are no longer *de minimis*. He argued that, as far as risk transfer is concerned, there can be no true risk transfer when a captive insurance company is involved. In response, another concurring judge rejected that analysis as not invoking insurance law principles but relying, rather, on economic theory. The lone dissenter would have adopted the concurring "economic" theory, but disagreed with the majority's "overreaching" opinion.

We need not reach the issue which divided the judges of the Tax Court—whether the addition of related insurance premiums into the insurance pool for tax year 1975 establishes risk transfer and justifies the deduction of insurance premiums paid by the unrelated party to the insurance pool. It is clear to us that, because of the guarantee to the primary insurers, Gulf and Insco did not truly transfer the risk, nor was there a de facto risk distribution to third parties, elements crucial to the allowance of a premium deduction.

## C. *Constructive Dividends*

■ We turn now to the insurance premiums paid by Gulf's foreign affiliates to Insco and to the claims paid by Insco to Gulf and its domestic affiliates, which the Commissioner argues constitute constructive dividends to Gulf. His theory is that "where funds are transferred from one such sibling corporation to another, ... the funds pass from the transferor to the common stockholder as a dividend and then to the transferee as a capital contribution." *Sammons*, 472 F.2d at 453.

In *Sammons*, the Court of Appeals for the Fifth Circuit formulated a two-part test to determine whether a transfer of property from one corporation to another corporation constitutes a constructive dividend to a common shareholder in both corporations. The first prong of the test is objective and requires a determination that there was a distribution of funds.

> A transfer of funds by a corporation to another corporation which the former owns directly or indirectly can be a constructive dividend to the individual controlling stockholder only if (1) the funds are diverted from the parent-subsidiary corporate structure and come within the control of the stockholder, and (2) no adequate consideration for the diversion passes from the stockholder to the corporation, *i.e.*, there must be a net distribution.

*Sammons*, 472 F.2d at 453–54. The second prong of the *Sammons* test is a subjective determination. Thus, a constructive dividend will be found where, in addition to the determination of distribution, "the business justifications [for the transfer] put forward are not of sufficient substance to disturb a conclusion that the distribution was *primarily* for shareholder benefit." *Sammons*, 472 F.2d at 452 (emphasis in original).

The Tax Court found that the second prong was not met since the insurance premium payments in question were for the benefit of the affiliates, *i.e.*, the affiliates were provided risk coverage. In other words, there was an adequate business reason for the payment of funds, here risk insurance, by the affiliates to Insco. The benefit to Gulf was tangential, the same "benefit" it would have received if an outside third-party insurer were to insure the losses of Gulf's affiliates.

The Commissioner provides no strong reason, support or authority to compel us to overturn either the Tax Court's factual determination of an adequate business reason for the transfer or the legal conclusion that the payments in question do not constitute constructive dividends to Gulf.

## D. *Conclusion*

The Tax Court did not err in denying a § 162 business expense deduction for insurance premiums paid to Gulf's captive insurance subsidiary (Insco) by Gulf and its domestic affiliates or in refusing to categorize the insurance premiums paid by Gulf's foreign affiliates to Insco and claims paid by Insco to Gulf's domestic affiliates as constructive dividends.

We will thus affirm the Tax Court's decision on these cross-appeals.

## IV. IRAN AGREEMENT

This final appeal presents the question of whether Gulf, as one of a particular group of oil companies, continued to hold an economic interest in Iranian oil and gas under a 1973 Agreement with Iran and the National Iranian Oil Co. (NIOC). Resolution of this question will determine whether, in tax year 1974,[34] Gulf can take a percentage depletion deduction under I.R.C. § 611 on proceeds from Iranian oil sales, and whether, in tax year 1975,[35] Gulf can claim a foreign tax credit under I.R.C. § 901 (rather than a deduction under I.R.C. § 164) for

---

**34.** Gulf could not take depletion deductions in tax year 1975 since effective January 1, 1975, percentage depletion deductions were no longer available (with a few exceptions) for oil and gas wells, per I.R.C. § 613(d).

**35.** Gulf could not claim a foreign tax credit in tax year 1974 since I.R.C. § 901(f) foreign tax credits relating to oil and gas only became effective for taxable years after December 31, 1974.

Iranian income taxes paid during 1975.[36] The Commissioner appeals the Tax Court's decision reported in *Gulf Oil Corp. v. Comm'r*, 86 T.C. 115 (1986), that Gulf did possess an economic interest under the 1973 Agreement.

Whether Gulf possesses an economic interest under the 1973 Agreement is a question of law involving statutory construction and interpretation over which we exercise plenary review. We find that Gulf possessed an economic interest, as a matter of law, under the 1973 Agreement and we will thus affirm the Tax Court's decision. Consequently, the percentage depletion deduction under I.R.C. § 611 in tax year 1974 and the foreign tax credit for Iranian income taxes paid under I.R.C. § 901 in tax year 1975 are proper.

### A. *Facts*

Iran became the sole owner of all its minerals and refineries when the Iranian oil industry was nationalized in 1951. National Iranian Oil Co. (NIOC) was organized at the time of nationalization to operate oil fields and refineries formerly run by Anglo–Iranian Oil Co., Ltd. (now known as the British Petroleum Co., Inc.). All NIOC shares were held by the Iranian government. Subsequently, Iran began negotiating with various oil company representatives to formulate a plan for resumption of the development and operations of the Abadan Refinery and the south Iranian oil fields. During this time, Iran mandated that all petroleum products produced in, or exported from, Iran were to be purchased from NIOC at the wellhead. Purchasers could then resell those products to affiliated and third-party customers.

A group of oil companies (the Consortium), including Gulf, entered into an agreement with Iran and NIOC on October 29, 1954 (the 1954 Agreement). The agreement consisted of two parts: Part I related to the Consortium's exploration, production, purchase and sale of Iranian crude oil, natural gas, and refined petroleum products; Part II comprised a final settlement between Iran and Anglo–Iranian Oil Co., Ltd. relating to outstanding claims between them resulting from the 1951 nationalization. Part I's stated objective was to provide for the effective marketing of these Iranian products, to be achieved through use of the capital, management and technical skills of the Consortium. The term of the agreement was twenty-five years, with the right to renew for three additional five-year periods.[37]

Pursuant to the 1954 Agreement, the Consortium formed two Dutch operating companies to function in a defined area of southern Iran known as the agreement area. One company was to explore and produce the crude oil, natural gas, and petroleum products; the other to refine those products. The products were produced for Iran, the holder of legal title to the minerals in place since the 1951 nationalization. Although the operating companies had the right to explore, produce and refine, Iran and NIOC retained several rights, such as the right to audit the accounts of the operating companies, to obtain technical data and other information pertaining to operations under the agreement, and to inspect the operating companies' technical activities.

The 1954 Agreement permitted each Consortium member to designate one of its subsidiaries as a trading company (registered in Iran) which was required to purchase from NIOC and to resell in Iran for export.[38] With respect to crude oil, the

---

**36.** The Tax Court was presented with the additional question of whether the 1973 Agreement was a nationalization of depreciable assets and, if so, whether I.R.C. § 1231 gain or loss should be recognized in tax year 1975. All events with respect to the alleged sale or exchange occurred in tax year 1973, a tax year not before the court. The Tax Court ruled that it had no jurisdiction to determine tax liability for a tax year where no deficiency was determined unless necessary for determining tax liability for tax years that were before the court. Neither party has appealed this ruling.

**37.** The agreement would be extended until 1984 if the first right to renew were exercised, until 1989 if the second were exercised, and until 1994 if the third were exercised.

**38.** Gulf International Co., a wholly owned domestic subsidiary, was Gulf's trading company. Virtually all of its purchases were repurchased

trading companies were required to purchase all that the exploration and production company produced, other than that used in the company's operations and the amount required by NIOC to meet Iran's internal consumption. The amount of crude oil and natural gas to be produced by the operating companies, after an operational loss allowance, was that required by NIOC for Iranian internal consumption plus NIOC's optional crude oil amount as in-kind payment from the trading companies,[39] and that required by the trading companies for resale. Title to crude oil and natural gas purchased passed from Iran to the trading companies at the wellhead, as it had since the 1951 nationalization. The trading companies paid NIOC a fixed percentage[40] of the 1954 Agreement's posted prices for the crude oil and natural gas, then resold in Iran at prices which were also regulated by the agreement. In addition to these stated payments to NIOC by the trading companies, NIOC received a sufficient amount of crude oil and gas to satisfy Iranian internal consumption. The trading companies were required to pay Iranian income tax on their profits from resale in Iran, although deductions were permitted for operating costs, the purchase price paid to NIOC, and a discount.

Acting through NIOC, Iran retained ownership of all the assets, while the operating companies had the right to use all fixed assets and facilities within the agreement area. Nonetheless, the operating companies were obligated, over the term of the 1954 Agreement, to replace these assets at their own expense, and the trading companies provided the financing for any new or additional assets or facilities. In recognition of the commitment to replace these assets, a fixed assets charge was included in the operating costs for the first ten years of the agreement. When a new or additional asset or facility was built or purchased for NIOC's benefit, cost or book value amount reimbursement, through an additional inclusion in operating costs, was permitted over ten years. The trading companies were also required to pay the operating companies' exploration, development and working capital costs, service fees, and maintenance of the assets and facilities used for operations. NIOC was obligated to pay that portion of the operating costs attributable to production required for Iranian internal consumption.

On September 17, 1954, in response to a request by Gulf's trading company, the Internal Revenue Service issued a ruling (the 1954 Ruling) on the 1954 Agreement, stating that the arrangement had "all the essential characteristics of a lease," 86 T.C. at 122, thereby creating an economic interest which would allow percentage depletion, and which would qualify the Iranian income taxes as creditable foreign income taxes. Prior to 1973 (when another sale and purchase agreement was entered into), parties to the 1954 Agreement amended that agreement four times;[41] however, the Consortium continued to operate using the same basic structure of the 1954 Agreement until 1973.

On July 19, 1973,[42] the Consortium entered into another sale and purchase agreement with Iran and NIOC (the 1973 Agree-

by Gulf Iran Co., another wholly owned domestic subsidiary, for resale to affiliated and third-party customers.

**39.** *See infra,* note 8.

**40.** For crude oil purchases, the payment was 12.5 percent of the posted price (or, at NIOC's option, delivery of crude oil in kind equal to the posted price). For natural gas, the payment was 5 percent of the posted price for each 1,000 cubic meters.

**41.** The dates and purposes of the amendments were: to make technical pricing changes (Janu-

ary 11, 1965); to specify Iranian's crude oil requirements to be delivered by Iran to certain other countries in exchange for goods (December 11, 1966); to set forth the trading companies' accounting and taxation concerning sales of natural gas liquid products (December 23, 1966); and, to provide for increases in posted prices and stabilization of tax rates through December 31, 1975 (the Tehran agreement) (February 14, 1971).

**42.** The effective date of the agreement was retroactively set as March 21, 1973.

ment).[43] The stated objective, taken from the preamble, was to develop and exploit Iran's hydrocarbon resources optimally, ensuring that Iran's crude oil and other products were accessible to consumers worldwide. The agreement stated Iran's determination that NIOC would exercise full and complete ownership, operation and control of the petroleum industry's mineral reserves, assets and administration. "WHEREAS with a view to the full realization of the[se] objectives ..., the Parties ... agree that the general relationship of Iran/NIOC and the above mentioned oil companies shall be revised and adjusted as set forth in this Agreement;...." 86 T.C. at 123–124. The term of this agreement was twenty years.[44] As occurred under the 1951 nationalization, NIOC retained exclusive ownership of assets, facilities and reserves, and title to the crude oil and other petroleum products passed to each trading company at the wellhead. Consistent with the terms of the 1954 Agreement, the 1973 Agreement also required that each trading company pay Iranian income tax on its resale profits.

The trading company concept was continued under the 1973 Agreement, and the trading companies were still required to purchase from NIOC and to resell in Iran for export. The two operating companies, however, were dissolved.[45] Pursuant to the 1973 Agreement, the Consortium formed a new joint stock company which, under a five-year renewable service contract, was to explore, drill and produce in accordance with NIOC's directives. NIOC funded the new joint stock company, including all required operations capital; however, the trading companies were required to advance, annually, 40 percent of NIOC's annual budgeted capital expenditures for operations as a prepayment for crude oil purchases. Each annual prepayment was to be amortized over ten years, and then set off against crude oil payments due to NIOC. The 1973 Agreement also permitted a payment set off for the amount the operating companies had not yet recovered by prior operating cost adjustments for the cost or book value of assets used or under construction as of March 20, 1973. The trading companies recouped the prepayments and the balance of the operating companies' reimbursements through production purchases.

Under the 1973 Agreement, NIOC was entitled to an annual amount of crude oil to satisfy Iran's internal consumption requirements plus an amount for export.[46] By September 1 of each year, after allowing for NIOC's quantity entitlements, NIOC was to notify the trading companies of the amount of crude oil that would be available to them in the following year; and, by October 1, the trading companies set forth their requirements. If, after all the trading companies' nominations were in, any excess crude oil remained for the following year, that excess became available to NIOC for export. However, if NIOC had no need, the trading companies could then purchase the excess. Therefore, each year, NIOC was committed to produce a quantity of crude oil and other petroleum products that would satisfy its own entitlement plus the Consortium's final nominations. After actual production, if NIOC had underestimated the total amount available, the trading companies could revise their nominations up to the increased level of the actual production. If NIOC either had overestimated the total amount available or, by force majeure, could not produce the amount required for export, NIOC and the trading companies ratably reduced their available quantities. If the ratable reduc-

---

43. This agreement was entered into even though the 1954 Agreement had not yet expired.

44. We note that the expiration dates of both the 1973 and 1954 Agreements would be about the same: the 1973 Agreement would expire in 1993; the 1954 Agreement (if the right to renew were exercised three times) would expire in 1994.

45. Effective July 19, 1973, both operating companies' rights and activities were terminated.

46. Although the facts do not make this clear, it appears this condition was simply incorporating the December 11, 1966 amendment to the 1954 Agreement. NIOC's stated quantity for export "was to be phased in over a nine year period and thereafter was subject to a ceiling." 86 T.C. 125.

tion was insufficient, only the trading companies' available quantities were to be reduced.

The trading companies' crude oil purchase pricing under the 1973 Agreement was composed of four parts: crude oil operating costs, limited to NIOC's costs for extracting the crude oil; 12.5 percent of the applicable posted crude oil price (the stated payment); a balancing margin; [47] and, interest. The trading companies' crude oil resale pricing regulations corresponded with those under the 1954 Agreement. Natural gas purchases were handled differently under the 1973 Agreement. Trading companies were now obligated to purchase all natural gas NIOC did not require for internal consumption. None of the trading companies' required annual prepayments (40 percent of NIOC's annual budgeted capital expenditures for operations) was allocated to a natural gas prepayment.

Gulf did not request a new Internal Revenue Service ruling concerning its economic interest status under the 1973 Agreement. However, the Internal Revenue Service did issue a ruling (the 1980 Ruling) on the 1973 Agreement on May 15, 1980, pursuant to another Consortium member's request. The 1980 Ruling indicated that the oil companies possessed nothing more than an economic advantage under the agreement; they did not hold an economic interest. Therefore, percentage depletion deductions and foreign tax credits would no longer be available.

In tax year 1974, Gulf reported a percentage depletion deduction under I.R.C. § 611 of $121,641,999 for depletion of hydrocarbons in Iran; in tax year 1975, Gulf

reported an Iranian foreign income tax credit under I.R.C. § 901(f) of $320,691,-083.[48] The Commissioner fully disallowed both entries, contending that Gulf no longer held an economic interest in Iranian gas and oil in place under the new 1973 Agreement. However, of the foreign tax credit amount reported, the Commissioner did allow a deduction of $289,760,918,[49] rather than a tax credit.[50] Finally, the Commissioner added a $2,801,811 capital gain under I.R.C. § 1231, determined to be realized and reportable (pursuant to I.R.C. §§ 451 and 1231) in tax year 1975 as a result of credits Iran gave to Consortium members for fixed assets under Article 10 of the 1973 Agreement.[51] The Tax Court disagreed with the Commissioner, finding that Gulf had demonstrated "that it had made and was continuing to make investments in the production of the minerals, which investments could be recovered solely by means of production of those minerals." 86 T.C. at 136. Therefore, Gulf continued to possess an economic interest, not merely an economic advantage, in the Iranian minerals in place after execution of the 1973 Agreement. The Commissioner appeals from this decision.

We turn to the dispositive legal question of whether Gulf possesses an economic interest under the 1973 Agreement. Only the owner of an economic interest in a depletable resource may take annual depletion deductions. Treas.Reg. § 1.611–1(b). With respect to foreign tax credits, a United States citizen or corporation is allowed a credit under I.R.C. § 901(a) for income taxes paid or accrued during the taxable year to any foreign country or United States

**47.** The balancing margin, taken together with all other financial and fiscal benefits accruing to Iran and NIOC, was to ensure that the total financial benefits to Iran and NIOC would be no less favorable than those applicable to other Persian Gulf countries. The 1973 Agreement estimated the balancing margin at $0.065 per barrel for the period March 21, 1973 through December 31, 1975. 86 T.C. at 126–27.

**48.** The parties subsequently stipulated that, during 1975, Gulf paid $243,795,264 in income taxes to Iran.

**49.** This figure consists of $243,795,264 in income taxes (found to be substantiated, but not creditable) plus $45,965,654 in noncreditable extra payments (not an income tax).

**50.** The $30,930,165 balance was disallowed both as a deduction and a credit.

**51.** Since the Tax Court ruled it had no jurisdiction to consider whether the 1973 Agreement was a nationalization of depreciable assets, adding a capital gain under I.R.C. § 1231 for tax year 1975 is obviously being disallowed.

possession. I.R.C. § 901(b)(1). Nonetheless, income taxes paid or accrued during the taxable year to any foreign country in connection with the purchase and sale of oil and gas extracted in that country are not to be considered as tax for purposes of I.R.C. § 901 if (1) the taxpayer has no economic interest in the oil or gas to which I.R.C. § 611(a) applies, and (2) either the purchase or sale is at a price which differs from the fair market value for such oil or gas at the time of such purchase or sale.[52] I.R.C. § 901(f).

Thus, if Gulf does not possess an economic interest under the 1973 Agreement, its tax implications are twofold. First, Gulf will not receive the benefit of a percentage depletion deduction for tax year 1974 under I.R.C. § 611. Second, Gulf will not receive the benefit of a foreign tax credit under I.R.C. § 901 for the Iranian income taxes paid in 1975; rather, those income taxes will have to be reported as a deduction under I.R.C. § 164.

### B. *Economic Interest Under the 1973 Agreement*

The test for the recognition of an "economic interest" was stated by the U.S. Supreme Court in *Palmer v. Bender*, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933): an economic interest exists where a taxpayer "has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." *Id.* at 557, 53 S.Ct. at 226; *see also* Treas.Reg. § 1.611–1(b). The Commissioner contends that under the 1973 agreement, Gulf's interest fails both prongs of the *Palmer* test.

The first prong has proven difficult for the courts to apply. As the Tax Court here recognized, the meaning of "economic interest" is vague. Many courts have found it difficult to single out one recurring factor that clearly indicates such ownership. *Tidewater Oil Co. v. United States,*

339 F.2d 633, 637, 168 Ct.Cl. 457 (1964). There is clearly no requirement that a holder of an economic interest must possess legal title, for an economic interest and a legal interest are two separate entities. "Economic interest does not mean title to the oil in place but the possibility of profit from that economic interest dependent solely upon the extraction and sale of the oil." *Kirby Petroleum Co. v. Comm'r*, 326 U.S. 599, 604, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946).

In *Palmer v. Bender*, the Supreme Court stated that

> the lessor's right to a depletion allowance does not depend upon his retention of ownership or any other particular form of *legal interest* in the mineral content of the land. It is enough, by virtue of the leasing transaction, he has retained a right to share in the oil produced.

287 U.S. at 557, 53 S.Ct. at 227 (emphasis added); *see also Thomas v. Perkins*, 301 U.S. 655, 661, 57 S.Ct. 911, 913, 81 L.Ed. 1324 (1937). Therefore, the fact that Iran holds legal title, as it has since the 1951 nationalization, is not determinative of whether Gulf possesses an economic interest under the 1973 Agreement. *See Comm'r v. Southwest Exploration Co.,* 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956) ("tax law deals in economic realities, not legal abstractions").

The Supreme Court has proposed several factors to consider in determining whether an economic interest in minerals in place exists. *Paragon Jewel Coal Co. v. Comm'r,* 380 U.S. 624, 633–34, 85 S.Ct. 1207, 1211–12, 14 L.Ed.2d 116 (1965); *Parsons v. Smith*, 359 U.S. 215, 225, 79 S.Ct. 656, 663, 3 L.Ed.2d 747 (1959). *See also Costantino v. Comm'r*, 445 F.2d 405, 409 (3d Cir.1971). More recently, in *Freede v. Comm'r*, 864 F.2d 671, 674 (10th Cir.1988), *cert. denied*, 110 S.Ct. 52, 107 L.Ed.2d 21 (1989), the Court of Appeals for the Tenth Circuit discussed five different factors to be considered.[53] *See also Tidewater Oil*

---

**52.** The Tax Court found that the oil purchases at issue were not at their fair market value.

**53.** The five factors enumerated were (1) the degree of legal interest in the minerals, (2)

whether there is significant control over the mineral deposits, (3) the extent of the contribution to the development or operation of the mineral extraction, (4) the risk of loss, and (5)

*Co.,* 339 F.2d at 637. All of the factors enumerated by the courts are simply considerations that we may examine in determining the existence of an economic interest in the particular case before us. Indeed, the Supreme Court has recognized the problems that arise in applying these stated principles to the peculiar circumstances of each case. *Paragon Jewel Coal Co.,* 380 U.S. at 627, 85 S.Ct. at 1208.

In the past, we have utilized the *Paragon Jewel Coal* factors in determining whether an economic interest exists, noting that perhaps the most important factor to consider is whether, under the contract, the taxpayer has the right to exhaust the mineral deposit to completion *or* whether, through a contract provision which empowers the owner to terminate the contract at will, the taxpayer is subject to the owner's will. *Whitmer v. Comm'r,* 443 F.2d 170, 173 (3d Cir.1971); *see also Costantino,* 445 F.2d at 409.

In determining that certain miners did not possess an economic interest in coal in place, the Court in *Paragon Jewel* noted that (1) the miners' investments were in movable equipment rather than in the coal in place; (2) their equipment investments could be recovered through depreciation rather than by depletion; (3) the contracts between the miners and the landowners were completely terminable without cause on short notice; (4) the landowners retained all the capital interest in the coal in place, rather than surrendering any portion to the miners; (5) the landowners owned the coal at all times, even after it was mined, precluding the miners from selling or keeping any of it; (6) the landowners retained all proceeds from the sale of the coal; and, (7) the miners could look only to the landowners for all sums due under their contracts. *Paragon Jewel Coal Co. v. Comm'r,* 380 U.S. at 633–34, 85 S.Ct. at 1211–12, *citing Parsons v. Smith,* 359 U.S. at 225, 79 S.Ct. at 663.

Applying the *Paragon Jewel Coal* factors to the circumstances of this case, we conclude that Gulf has an economic interest in the Iranian hydrocarbons under the 1973 Agreement. The Consortium members invested substantial capital, under the 1954 Agreement, in Iranian plant assets and facilities which, at the time of the 1973 Agreement, the members had not fully recovered. Some of these assets (e.g., buildings) were obviously not movable. Because Iran held legal title to all assets since the 1951 nationalization, Gulf could not have depreciated any of those assets to recoup the invested capital.[54] Also, other than Iran and NIOC, the Consortium held the exclusive right, through the trading companies, to sell the minerals, thereby demonstrating that it clearly retained a right to share in the oil produced. *See Palmer,* 287 U.S. at 557, 53 S.Ct. at 226. Finally, with regard to the contract being terminable at will, the 1973 Agreement was a long term contract (with a term of twenty years), rather than one terminable at will by Iran or NIOC without cause on short notice.

■ We are unpersuaded by the Commissioner's assertion that Gulf possesses merely an economic advantage under *Helvering v. Bankline Oil Co.,* 303 U.S. 362, 367–68, 58 S.Ct. 616, 618, 82 L.Ed. 897 (1938). We agree that where a taxpayer merely processes the mineral and is not engaged in production, that taxpayer may have an "economic advantage" from production, but has no economic interest in the mineral in place. *Bankline Oil Co.,* 303 U.S. at 367–68, 58 S.Ct. at 618. As well, where a taxpayer has no capital investment in the mineral deposit, a mere economic advantage derived from production through a contractual relation to the owner does not constitute an economic interest. *Bankline Oil Co.,* 303 U.S. at 367, 58 S.Ct. at 618; *see also* Treas.Reg. § 1.611–1(b)(1). Here, however, Gulf and the other members of the Consortium have, in fact, made

whether the interest is necessarily depleted as the mineral is extracted. *Freede,* 864 F.2d at 674.

**54.** Compare this factual situation with the one involving the Kuwait nationalization after which Gulf was compensated for its lost capital pursuant to OPEC standards of paying for the book value of the assets in place.

capital investments in Iranian plant assets and facilities that were still not recovered. Moreover, the Tax Court found that Gulf had made, and was continuing to make, investments in the production of the minerals. 86 T.C. at 136.

The second prong of the *Palmer* test, that the return on the investment must be realized solely from the extraction of minerals, "has been interpreted to mean that the taxpayer must look *solely* to the extraction of oil or gas for a return of his capital." *Southwest Exploration Co.*, 350 U.S. at 314, 76 S.Ct. at 399. In allowing depletion deductions, for which possession of an economic interest is a requisite, Congress was trying to encourage mineral discovery and development. *Tidewater Oil Co.*, 339 F.2d at 637. Depletion allowances are "based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit.... [The allowance] is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is not impaired...." *Southwest Exploration Co.*, 350 U.S. at 312, 76 S.Ct. at 397–98. "The test for the right to depletion is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted." *Kirby Petroleum Co.*, 326 U.S. at 603, 66 S.Ct. at 411. The "investment" test requires only an economic commitment to look to production of the mineral for income. *Southwest Exploration Co.*, 350 U.S. at 316, 76 S.Ct. at 399.

We begin our analysis of the second prong with the specific term of the 1954 Agreement, under which Consortium members were operators or producers, which the 1954 Internal Revenue Ruling characterized as the equivalent of a lease. The Commissioner claims that under the 1973 Agreement the Consortium's role was changed substantially and they became merely purchasers. The Commissioner asserts that Gulf's profits were derived from the purchase (at the wellhead) and resale of the oil, rather than from the extraction and sale of the oil. We note, however, that the 1973 Agreement provided for recoupment of capital investments by set off, over time,

in the trading companies' purchase prices from NIOC. Thus, there was capital invested prior to the 1973 Agreement which had not been recovered and could only be recovered through the profits made by way of purchase at the wellhead, which depended on extraction of the oil. Clearly, Gulf had an economic commitment to look to the production of oil for a return on its investment. *See Southwest Exploration Co.*, 350 U.S. at 316, 76 S.Ct. at 399.

Further, the Commissioner argues that it was by no means clear that production, followed by the trading companies' purchases and subsequent resales of oil, was the only means by which the Consortium members could recover their "investment." Yet the Tax Court found that the 1973 Agreement established no other method for the Consortium members to recover their investments, 86 T.C. at 136, and we reach the same conclusion.

Finally, we turn to the Commissioner's challenge of the Tax Court's finding that the 1973 Agreement merely revised and adjusted the 1954 Agreement. We have reached our conclusion that Gulf held an economic interest in the Iranian gas and oil deposits under the 1973 Agreement independent of this finding. Thus, we need not review the Commissioner's contention that the Tax Court erred by determining that Gulf possessed an economic interest because the 1973 Agreement was a modification and extension of the 1954 Agreement.

### C.  *Conclusion*

We conclude that Gulf possesses an economic interest in Iranian oil and gas deposits under the 1973 Agreement. Gulf is therefore entitled to a depletion deduction for tax year 1974 and a foreign tax credit for tax year 1975.

### V.  CONCLUSION

Gulf Oil Corporation has filed a motion for a remand for recomputation under Rule 55 to calculate the 1977 and 1978 net operating loss carryback for Gulf's tax years 1974 and 1975. As a result of our decisions in these appeals, a remand is necessitated

for both tax years. Therefore, the matters raised in the motion can properly be presented to the Tax Court on remand.

We will remand these appeals to the Tax Court for recalculation consistent with this opinion.