**LOMBARD BROTHERS, INC.,**
**Plaintiff–Appellee,**

v.

**UNITED STATES of America,**
**Defendant–Appellant.**

**No. 296, Docket 89–6123.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 19, 1989.

Decided Jan. 19, 1990.

Richard Farber, Tax Div., Dept. of Justice, Washington, D.C. (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Nancy G. Morgan, Tax Div., Dept. of Justice, Washington, D.C., Stanley A. Twardy, Jr., U.S. Atty., New Haven, Conn., of counsel), for defendant-appellant.

Andrew B. Bowman, Westport, Conn., for plaintiff-appellee.

Before LUMBARD, MESKILL, and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This case involves a taxpayer's claim that certain investment losses are deductible as theft losses under the Internal Revenue Code of 1954, 26 U.S.C. § 165(a) (1982) (now Internal Revenue Code of 1986) (collectively "Tax Code"), because the investment company making the investments on the taxpayer's behalf engaged in highly speculative securities trades and made several material misrepresentations to the taxpayer about the value of its investment account. We conclude that the investment company's acts did not constitute larceny under Connecticut law and that the losses therefore are not deductible under Section 165(a). We therefore reverse.

## BACKGROUND

The plaintiff Lombard Brothers, Inc. is a Connecticut trucking corporation. In September 1976, George Quinion, Jr., president of General Asset Management Co., Inc. ("GAM"), a Connecticut investment firm, approached his college acquaintance Anthony Lombard, treasurer of Lombard Brothers, and encouraged him to allow GAM to manage Lombard Brothers' surplus cash. Quinion indicated that he could earn a ten percent return on that cash by investing in government securities, compared to the four or five percent it was then earning on certificates of deposit. That month, Lombard Brothers entered into an agreement with GAM that granted GAM complete discretion to invest funds deposited by Lombard Brothers in a custodian account. The initial deposit was $800,100.

The agreement authorized GAM "to manage the Assets and render investment advisory and other related services ... [and] to make all decisions with respect to (i) the investment policies and (ii) the purchase, sale, and retention of particular securities." GAM agreed to provide monthly investment reports, including a list of all transactions made for Lombard Brothers' account and all securities and cash in the account. The agreement entitled GAM to a quarterly investment advisory fee of one-half of one percent of the asset value of Lombard Brothers' account. The last page of the agreement contained the following notation: "Contract restricted to U.S. Government obligations only until further notice in writing."

Although GAM appears literally to have complied with the restriction to investments in U.S. government securities (a fact not material to our disposition of this case), it adopted a highly risky investment strategy, including long and short sales of securities, repurchase agreements ("REPO's"), and reverse REPO's. To make matters worse, GAM made many of these investments on margin, thereby putting at risk an amount substantially larger than Lombard Brothers' investment. Substantial

losses ensued. GAM's monthly statements to Lombard Brothers failed to report the losses fully, however, and thus overstated the book value of the account. Nevertheless, the riskiness of GAM's investment strategy should have been evident to Lombard Brothers from the outset, because the monthly statements indicated the risky nature of the trades. Moreover, the dollar volume of trades disclosed by the statements greatly exceeded the amounts invested, a clear indication that trades were being made on margin. Indeed, Anthony Lombard testified that he had become suspicious of GAM as early as the fall of 1976 because Lombard Brothers had failed to receive any checks. Although he also testified that he had at that time requested partial repayment of the invested funds, Lombard Brothers nevertheless allowed GAM to continue to manage the funds in the account.

By the spring of 1977, Lombard Brothers was openly expressing its displeasure with the account. In March, Quinion wrote to Joe Bartoli, Lombard Brothers' comptroller, to confirm an oral conversation in which Quinion had explained the GAM market strategy of attempting "to take advantage of even small movements in the market" and in which he had reminded Bartoli that he "never guaranteed ... profits in this money game." In May 1977, GAM acknowledged that its investment strategy had yet to pay off and relieved Lombard Brothers of any obligation for management fees until the account began to reflect a profit.

Events had turned still worse by April 1978, and William Jones, the officer of GAM who managed the Lombard Brothers account, telephoned Anthony Lombard to notify him of a margin call. Jones informed Lombard that Lombard Brothers had to wire a substantial amount of funds to the custodian account by that afternoon or risk losing a much larger amount—perhaps some $40 million. At a specially called meeting, Lombard Brothers' board of directors voted to wire $850,000 to the custodian account. After yet more margin calls, it sent an additional $920,000. Thus, during April and May, Lombard Brothers deposited a total of $1.77 million in the custodian account in response to margin calls.

Hoping to recoup its losses, Lombard Brothers threw good money after bad in the ensuing months. A third set of deposits, from June 1978 through March 1979, totalled $901,794.12. Finally, in the spring of 1979, Lombard Brothers stopped investing with GAM. The bottom line was a loss of $2,952,894.12 on an investment of $3,471,894.12.

In late 1979, Lombard Brothers filed a civil action against GAM in Connecticut state court. However, after the suit was dismissed as against several New York parties for lack of personal jurisdiction, and, after learning that GAM and Quinion were essentially judgment-proof, Lombard Brothers abandoned the action. Lombard Brothers never advised any law enforcement agency that it was the victim of larceny, embezzlement, robbery, or other theft-like act in connection with its relationship with GAM.

In its 1978 federal income tax return, Lombard Brothers claimed a short-term capital loss of $1,965,610.14 in connection with the GAM losses. It later filed an amended return for 1978 in which it claimed an entitlement to an increase in its total ordinary deductions of that same amount. The amended return did not set forth the reason for the increased deduction. Then, in 1981, Lombard Brothers filed amended returns for 1976 and 1977, carrying back the net operating loss resulting from the GAM losses discovered in 1978. When the IRS disallowed the refunds claimed for 1976 and 1977, Lombard Brothers filed the present action in the District of Connecticut.

Applying the Connecticut penal code definition of "theft" to each of the claimed deductions, the district court found that GAM committed no theft in connection with Lombard Brothers' initial deposit of $800,100 or in connection with the third set of deposits totalling $901,794.12 from June 1978 through March 1979. However, with respect to the second set of deposits total-

ling $1.77 million made in response to the margin calls during April and May 1978, the district court found that, through its alleged omissions and misrepresentations, GAM had effectively "appropriated Lombard's funds to its own use to cover up its own gross malfeasance and acted with complete knowledge that the funds would be disposed of in such a manner that Lombard would never be able to recover them." Thus, the district court concluded that GAM had committed larceny under Connecticut law with regard to the specified funds and that Lombard Brothers was entitled to claim a theft loss of $1.77 million. The government appealed. We reverse.

## DISCUSSION

Section 165(a) of the Tax Code authorizes the deduction of "any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). The Section permits a deduction for, inter alia, losses resulting from theft. *See* 26 U.S.C. § 165(e). For purposes of Section 165, "theft" includes larceny, embezzlement, and robbery, *see* 26 C.F.R. § 1.165–8(d), as defined by the law of the state where the claimed loss occurred—in the instant matter, Connecticut. *See Bagur v. Commissioner*, 603 F.2d 491, 501 (5th Cir.1979). Moreover, to gain the deduction, Lombard Brothers had the burden of proving by clear and convincing evidence that it was caused by larceny or similar criminal acts. *See Bonney v. Commissioner*, 247 F.2d 237, 239 (2d Cir.), *cert. denied*, 355 U.S. 906, 78 S.Ct. 333, 2 L.Ed.2d 261 (1957); *see also Helvering v. Leonard*, 310 U.S. 80, 85–86, 60 S.Ct. 780, 783–84, 84 L.Ed. 1087 (1940) (stating that taxpayer must establish by "clear and convincing proof" that local law supports his claim of nontaxability under federal law) (citing *Helvering v. Fitch*, 309 U.S. 149, 156, 60 S.Ct. 427, 430, 84 L.Ed. 665 (1940)).

In pertinent part, the Connecticut penal code defines larceny as follows:

A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, ob-

tains or withholds such property from an owner.

Conn.Gen.Stat.Ann. § 53a–119 (West 1985). A finding of larceny under that statute requires the proof of: (1) the intent to deprive another of property, and (2) the wrongful taking, obtaining, or withholding of the property. *See State v. Kurvin*, 186 Conn. 555, 568, 442 A.2d 1327, 1332–33 (1982), *overruled on other grounds, State v. Avcollie*, 188 Conn. 626, 453 A.2d 418 (1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2088, 77 L.Ed.2d 299 (1983).

The parties agree that GAM's actions with respect to the margin calls constituted a wrongful taking and therefore satisfied element (2). However, the government challenges the district court's finding of element (1), the "intent to deprive another of property." The Connecticut penal code defines "deprive" as follows:

To "deprive" another of property means (A) to withhold it or cause it to be withheld from him permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to him, or (B) to dispose of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property.

Conn.Gen.Stat.Ann. § 53a–118(a)(3) (West 1985). In order to prove an intent to deprive, therefore, Lombard Brothers had to show that GAM *intended* either: (1) to withhold the funds permanently or for so long a period that they lost their economic value, or (2) to dispose of the funds so as to make recovery unlikely. This is a criminal statute, and it is not enough to show that GAM may have disposed of the funds in a negligent way that made recovery unlikely. Rather, GAM's *intent* to make recovery unlikely by its disposition of the funds must be shown.

The district court found that GAM possessed the intent to deprive Lombard Brothers of the funds because it, GAM, had full knowledge of the riskiness of the additional investment. It thus stated:

GAM wrongfully obtained [the $1.77 million in transfers] by misrepresenting

both the existence and scope of prior losses and exaggerating the threat posed by the margin call. These funds were obtained without Lombard's knowing consent. Furthermore, GAM obtained these monies with the requisite intent to permanently deprive Lombard of them. By fabricating the extent of the margin call in order to induce Lombard to make additional transfers of funds, GAM, in effect, appropriated Lombard's funds to its own use to cover up its own gross malfeasance and acted with complete knowledge that the funds would be disposed of in such a manner that Lombard would never be able to recover them.

We disagree. We believe Lombard Brothers failed to meet even a preponderance-of-evidence test on these issues.

First, the record is extremely murky with regard to whether GAM "exaggerat[ed] the threat posed by the margin call" or "fabricat[ed] the extent of the margin call." Lombard Brothers' witness appeared not to have a specific recollection of GAM's estimates of threatened losses. Anthony Lombard, who testified that GAM advised him of the threat of enormous losses, gave various descriptions of the threat, ranging from "a considerable amount of money being in the millions, 10, 15, all kinds of figures" to "20, 30, many million more dollars" to "20, 30, 40 million." However, he never claimed that GAM had exaggerated. It is clear in the record, however, that the losses were potentially enormous. Kenneth Stevenson, Jr., the GAM accounting head who testified for Lombard Brothers, stated that GAM was making daily trades of well over $1 million and even as high as $7 or $8 million on the Lombard Brothers account. His testimony was verified by the GAM transaction ledger for the Lombard Brothers account in April 1978. The most extreme example occurred on April 4, 1978, when one REPO transaction alone involved $11 million. Such high daily volume could lead to enormous losses in the event of a failure to meet a margin call. Lombard Brothers has not designated any evidence to the contrary, its brief on appeal merely restating, without citation to the trial record or exhibits, the conclusions of the district court.

Second, the exaggeration issue is a red herring because the margin call could not have been intended "to cover up [GAM's] gross malfeasance." To the contrary, GAM's reporting of a potentially enormous loss was actually a dramatic confession of its malfeasance. Indeed, the greater the exaggeration, the more inculpatory the confession of malfeasance. As Anthony Lombard testified, it was the margin call that revealed to Lombard Brothers the extent of the risk and of the losses to which it was exposed. To be sure, malfeasance occurred in the concealment of losses before April 1978, but the margin call at that time revealed rather than concealed the malfeasance.

Finally, we do not agree that GAM "acted with complete knowledge that the funds would be disposed of in such a manner that Lombard would never be able to recover them." Nor do we agree with the district court's implied finding that GAM intended to make further losses likely. There is no evidence that GAM intended that Lombard Brothers lose its funds. Instead, GAM was attempting at the time of the first margin call to prevent the loss of additional funds. Indeed, both parties agree that GAM and Lombard Brothers were in fact attempting to recoup the earlier losses the account had suffered, and Lombard Brothers can hardly deny that by this time they were fully apprised of the nature of GAM's trading. In fact, they deposited over $900,000 in the months following the $1.77 million in question. Moreover, because GAM had suspended Lombard Brothers' obligation to pay a management fee until the account showed a profit, GAM had no incentive to make deliberately unprofitable trades. Thus, although GAM's hopes for the continued investment may have been unrealistic, neither evidence nor logic supports the conclusion that GAM possessed the intent to make recovery unlikely.

Reversed.