

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-24-1998

# Estate of Meriano v. Commissioner IRS

Precedential or Non-Precedential:

Docket 96-7329

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Estate of Meriano v. Commissioner IRS" (1998). *1998 Decisions.* Paper 90.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/90

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 24, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-7329

ESTATE OF PHILIP MERIANO, DECEASED,
ANITA PANEPINTO, ADMINISTRATRIX,

        Appellant

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE

On Appeal from an Order of the
Commissioner of the Internal Revenue
(Action No. 81-26622)

Argued on January 31, 1997

Before: BECKER,[1] Chief Judge and ROTH, Circuit Judges,
and BARRY,[2] District Judge

(Opinion Filed April 24, 1998)

James S. Tupitza, Esquire
Tupitza & Marinelli
212 West Gay Street
West Chester, PA 19380

_____

1. Honorable Edward R. Becker assumed Chief Judge status as of
February 1, 1998.

2. Honorable Maryanne Trump Barry, United States District Court Judge
for the District of New Jersey, sitting by designation.

Stephen D. Hamilton, Esquire
  (Argued)
Alfred W. Putnam, Jr., Esquire
Drinker, Biddle & Reath
1345 Chestnut Street
Philadelphia National Bank Building
Philadelphia, PA 19107

 Attorneys for Appellant

Loretta C. Argrett
Assistant Attorney General
Gary R. Allen
David I. Pincus
Kenneth Rosenberg (Argued)
United States Department of Justice
P.O. Box 502
Washington, D.C. 20044

Stuart L. Brown, Esquire
Internal Revenue Service
1111 Constitution Avenue, S.W.
Washington, D.C. 20224

 Attorneys for Appellee

OPINION OF THE COURT

ROTH, Circuit Judge:

In this case, we must decide whether an estate is entitled to a theft loss deduction under the federal tax code for funds wrongfully paid out from an estate and never returned. The decedent, Philip Meriano, left an estate that included over one million dollars worth of bearer bonds. The bonds had been stolen from Meriano but were later returned to the estate. Excessive fees and costs were charged against the estate by the stockbroker and the attorney/investigator who had retrieved the bonds and administered the estate. The IRS assessed the estate with a deficiency. The estate then claimed before the U.S. Tax Court that the stockbroker and the attorney/investigator had committed theft under Pennsylvania state law and that

2

the estate was therefore entitled to a deduction for its loss pursuant to 26 U.S.C. S 2054. The tax court denied the deduction and the estate appealed. For the following reasons, we will reverse the tax court's decision and allow the estate its deduction.

I. FACTS

The facts of this case were set forth in great detail by the tax court. We will recount only those facts that are relevant to the issues on appeal. Philip Meriano died on November 14, 1977. Four months earlier, a fire at Meriano's residence had destroyed documentation of his ownership of municipal bearer bonds with a face value of approximately two million dollars. Not long after the fire, Meriano notified the Philadelphia Police Department that the bonds themselves were missing from a safe located in an area of the residence damaged by the fire.

When Meriano died, his elderly sister, Mary Orlando, was appointed administratrix of his estate, under the assumption that he had died intestate. With the help of her husband, Anthony, Mary Orlando attempted to locate the missing securities. She was not successful until her husband asked Edward Reardon, a stock broker, for help. Reardon, in turn, contacted John Lynch, an attorney and investment banker who had experience in the field of municipal bonds.

On August 7, 1978, Mary Orlando signed a contingent fee agreement with Lynch to compensate him in the event he recovered any of the missing securities. Under the agreement, Lynch was to receive one-third of the face value of any securities recovered prior to the filing of a lawsuit. If any securities were recovered after suit was filed, Lynch was to receive forty percent of the face value. Orlando and Lynch both signed the document; Orlando's husband, Anthony, and her daughter, Connie Kates, both signed as witnesses. The agreement contained no provision for Reardon's payment, nor did Reardon sign it. See Appendix, at 52.

Shortly after executing his agreement with Orlando, Lynch entered into a separate agreement with Reardon,

3

under which Reardon would assist Lynch with his search for the stolen bonds and Lynch would compensate him with 15 percent of the face value of any of the securities that were recovered.

Lynch and Reardon eventually traced the securities to an account held by Philip Meriano's former housekeeper, Italia Bossi. Based on information from Reardon and Lynch, the FBI on May 1, 1979, was able to confiscate bearer bonds having a value of $1,823,000 from the Bossi's residence in San Diego. Bossi and her husband were brought back to Philadelphia, where they were charged with arson and theft. Their trial resulted in a hung jury. After the government failed to convict them, the Bossis requested that the FBI return the bonds to them.

In December 1979, Lynch retained his brother's law firm, Groen, Smolow and Lynch, to assist the estate in any civil suits necessary to protect the value of the recovered bearer bonds. Lynch also retained Groen, Smolow as general counsel for the estate. When the U.S. Attorney decided in 1980 to forego a second trial of the Bossis, the estate and the Bossis both filed civil actions in the U.S. District Court for the Eastern District of Pennsylvania to get control of the securities.

That same year, the estate settled the suits with the Bossis. Under the settlement agreement, the estate recovered securities with a face value of $1,623,000 and a fair market value of $1,146,446. Without the help of Lynch and Reardon, the estate would have not recovered these securities.

Along with the Green, Smolow law firm, Lynch continued to represent the estate. On April 10, 1980, Lynch and Anthony Orlando deposited the recovered securities in a safety deposit box at the Provident bank. That same day, Lynch and Reardon signed a "hold harmless" agreement with Mary Orlando. The agreement stated in pertinent part:

> Dated as of this 10th day of April, 1980, in consideration of the disbursement of certain funds deemed earned as professional fees pursuant to prior agreements with Mary Orlando, in her capacity as the duly appointed Administratrix of the Estate of Philip

4

> Meriano, Edward J. Reardon, Jr. and John T. Lynch
> Jr., Esquire, agree(s) to INDEMNIFY AND HOLD
> HARMLESS the Estate of Philip Meriano and Mary
> Orlando, the Administratrix of the Estate and against
> any and all claims and loss, which the Estate and/or
> the Administratrix may hereafter suffer or pay by
> reason of any claims against the Estate or the
> Administratrix or as a result of the disbursement of
> said funds of the Estate in payment of professional fees
> and hereby agree to repay any and all amounts
> received that are determined by a court of proper
> jurisdiction to be returnable to the Estate.

Appendix, at 109 (emphasis added). Both Reardon and
Lynch signed the agreement.

Sometime after this agreement was executed, Lynch
transferred the securities from the safety deposit bank to
an account at Kidder, Peabody & Co. On April 29, 1980,
Mary Orlando signed an agreement authorizing Lynch to
buy, sell or otherwise transact business with the securities.
Under the terms of this agreement, Orlando agreed that she
would "waive notification . . . of any of the aforementioned
transactions and delivery of any statements, notices, or
demands pertaining thereto and hereby ratify any and all
transactions heretofore or hereafter made by [Lynch] on or
for [the] account." Appendix, at 110.

In addition to creating the estate's account, Lynch and
Reardon also established individual accounts with Kidder,
Peabody. Over the next three years, Lynch transferred some
of the estate's bonds to his individual account. From this
account, Lynch liquidated the securities and used the
proceeds to pay himself and Reardon, and also to pay the
Groen, Smolow law firm, which sought fees for general
services to the estate and for costs associated with the
recovery of the stolen bonds. The trial record reflects that
Lynch did not keep organized records of the transfers of the
bonds from the safe deposit box to the estate's Kidder,
Peabody account. Similarly, Lynch did not record in an
organized fashion the withdrawals from the estate's account
at Kidder to his own individual account. See Appendix, at
272–273.

5

On December 9, 1980, Mary Orlando filed a petition with the Orphans' Court for approval of attorney and related fees paid to Lynch and Reardon. Because there was some uncertainty as to the proper personal representative of the estate (see discussion below), the Orphans' Court deferred action on the petition until the estate filed an accounting with the auditing judge of the court. See Appendix, at 87. Notwithstanding the court's deferral, however, Orlando approved payment of $418,250 to Lynch and $250,950 to Reardon in a document signed by Mary Orlando and witnessed by her husband and her daughter.[3]

The Will Contest

In August of 1980, Anita Panepinto, a niece of Meriano's deceased wife, discovered a will executed by Meriano and dated November 17, 1973. She also found a codicil, dated December 2, 1973. The will and codicil named Panepinto and another niece, Elaine Hernardi, as beneficiaries of the estate. On August 30, 1980, Panepinto presented the will to the Register of Wills in Philadelphia.

Two years later, the will recovered by Anita Panepinto was admitted to probate. The Register of Wills then revoked Mary Orlando's position as administratrix and appointed Panepinto as administratrix, c.t.a (cum testemento annexo).[4] In 1983, Panepinto filed a motion in the tax court to substitute herself for Mary Orlando as the estate representative in the present proceeding.

Orlando and Kates contested the will. By 1986, however, Panepinto and Orlando had resolved their differences and agreed to settle their competing claims to the Meriano

_____

3. This agreement is marked "approved by court 3-9-81." This notation refers to an order by Judge John B. Hannum, of the United States District Court for the Eastern District of Pennsylvania, approving fees. Judge Hannum had presided over the litigation between the estate and the Bossis with regard to the disposition of the stolen securities. On October 2, 1981, Judge Hannum vacated this order of approval on the ground that he had lacked ancillary jurisdiction to approve the fees in the first place. See Appendix, at 108; 138-139; 426-27.

4. An administrator c.t.a. has the same powers as an executor of an estate. See 20 Pa. C.S. S 3325.

estate. Under the terms of the settlement, Panepinto agreed to release Orlando and her surety, INA, from any future surcharge liability. Orlando and Kates withdrew their will contest on December 19, 1986.

The Orphans' Court Proceedings

On March 30, 1983, Panepinto filed two petitions with the Orphans' Court, which sought reimbursement of all fees paid to Lynch and Reardon. According to Panepinto, the fees were grossly excessive, and the agreements signed by Orlando, the former administratrix, were unconscionable as a matter of law.

In an attempt to determine what was left in the estate and what Lynch had disbursed to himself and his colleagues, the Orphans' Court ordered Mary Orlando to file an accounting with the court. Orlando, who was by this time represented solely by Lynch and no longer by the Groen Smolow law firm, did not do so. As a result, the Insurance Company of North America (INA), which had acted as surety on Orlando's administratrix bond, filed the requested accounting with the court. According to the testimony of Robert Boote, an attorney retained by INA, Lynch had failed to maintain organized records for the estate and had not been forthcoming in providing appropriate records.

Boote prepared a First and Final Account of Mary Orlando, which INA, as surety, filed on March 30, 1983. That account showed that the estate had paid Reardon $220,000 in fees and Lynch $415,761 in fees. INA eventually attributed additional fees to Lynch, for a total of $500,761.19. Reardon also received an additional $30,950 from Lynch on April 15, 1981, for a total of $250,950. See Appendix at 584.

Judge Kendall Shoyer of the Orphans' Court conducted an audit of the estate between May 2, 1986, and March 24, 1987. Judge Shoyer then considered Panepinto's motion to reduce or deny part or all of the fees paid out by the estate to Lynch and Reardon. As a result of the audit, Judge Shoyer ordered Lynch and Reardon to reimburse a portion of their fees to the estate. In doing so, Judge Shoyer

criticized Lynch's poor ethics as an attorney, particularly Lynch's unilateral removal of the securities from the estate, his failure to keep adequate records, and his failure to cooperate with the preparer of the account. See Estate of Meriano, No. 2259 (Orphans' Court Division, Court of Common Pleas of Philadelphia, filed September 21,1988).

With regard to Lynch's fee, Judge Shoyer held that a reasonable fee should be based on the fair market value and not the face value of the securities, notwithstanding Lynch's written agreement with Orlando. In addition, Judge Shoyer held that Lynch's contingent fee should be reduced from 40 percent to 35 percent of the fair market value of the bonds due to his lack of cooperation with INA's preparation of the estate's final account. Finally, Judge Shoyer allowed Lynch to credit only a portion of the fees he had paid out to the Groen, Smolow law firm. As a result, the Orphans' Court judged Reardon liable for $78,983.10, plus six percent interest from the dates he received the funds from the estate. Judge Shoyer assessed Lynch's debt to the estate to be $99,505.09, which represented the difference between the amount he had taken and the amount to which he was entitled. Judge Shoyer added $7,500 to this amount due to Lynch's failure to account for unexplained "costs" for which he had disbursed funds from the estate on February 16, 1980.

All of the parties took exception to the court's adjudication. As a result, the Orphans' Court sitting en banc reheard the case and issued a new schedule of surcharges. See Estate of Meriano, No. 2259 (Orphans' Court en banc, filed August 1, 1989). First, the en banc court agreed with Judge Shoyer that the contingent fee should be based on the fair market and not face value of the bonds. In addition, the Orphans' Court sitting en banc credited Lynch for several disbursements to the Groen law firm that had not been recognized by Judge Shoyer. Lynch's surcharge therefore was initially reduced to $23,559.09. This reduction, however, did not end the matter of excessive fees.

The Orphans' Court expressed concern that, even after adjusting Lynch and Reardon's fees for fair market value

8

instead of face value, the fees were still too high. The court explained:

> Although the auditing judge does not expressly address the issue, it is clear from the amounts of compensation awarded to Lynch and Reardon that he found that Lynch was to receive 35% of the market value of the [recovered] bonds and that Reardon was to receive 15% of the market value of the bonds that each man was compensated from the gross estate. We are of the opinion that an allowance of 50% of the market value of the assets recovered is unreasonable and excessive and was error for the auditing judge to allow that amount of compensation.

En banc opinion, at 20. According to the Orphans' Court, Lynch should have paid Reardon out of his own funds and not those contained in the gross estate. Id. The Orphans' Court therefore ordered Lynch to pay Reardon's fair market fee, $171,966.90, back to the estate, in addition to the $23,559.09 he already owed for the overpayment on his own fee. In addition, Lynch was to pay six percent interest on these sums, from the date of receipt until the day the money was reimbursed. Id.

Once more, the parties appealed the decision of the Orphans' Court. The Superior Court affirmed it per curiam on June 13, 1990. In re Estate of Meriano, 579 A.2d 423 (Pa. Super. 1990). The Pennsylvania Supreme Court refused to hear Lynch's petition for appeal on January 15, 1991. In re Estate of Meriano, 593 A.2d 421 (Pa. 1991). Thus, Lynch remained liable to the estate for a total sum of $195,525.99, plus six percent interest running from the date of receipt of the funds.5 Reardon owed the estate $78,983.10, plus six percent interest.

Neither Reardon nor Lynch adhered to their obligations.

---

5. The parties stipulated that Lynch owed $195,516.00, which is $9.99 less than the sum of $171,966.90 and $23,559.09. See Joint Stipulation of Facts, at P20. This discrepancy, however, appears to be the result of a simple arithmetic mistake since the Joint Stipulation states the correct sums that were to be added in order to determine Lynch's total liability. See id.

Lynch attempted to declare bankruptcy in 1989, but had his petition dismissed in 1990, due to his failure to file required schedules. In his petition for bankruptcy, Lynch listed the estate as a creditor for the sum of $225,000. After his attempt to declare bankruptcy failed, Lynch never paid any of the money he owed to the Meriano estate.

Unlike Lynch, Reardon apparently maintained some contact with the estate and entered into a settlement agreement for an undisclosed amount that was less than the sum charged to him by the Orphans' Court. The tax court noted that one of the estate's attorneys filed a status report on March 19, 1990, in which the attorney reported that all claims against Reardon had been settled. Of the amount negotiated by settlement, Reardon paid only $25,000.

The Present Proceeding

This proceeding began when the Commissioner served the estate with a Notice of Deficiency in the amount of $732,106.81. In addition, the estate was assessed $366,053.41 for fraud pursuant to 26 U.S.C. S 6653(b). The Commissioner commenced proceedings against the estate in 1981. Over the last fifteen years, the parties have settled many of the issues regarding the estate's tax deficiency. See Stipulation of Disposition of Issues, filed September 3, 1985; Second Stipulation of Disposition of Issues, filed November 26, 1993; Joint Stipulation of Facts, filed December 5, 1994.

A special trial judge heard this case in December of 1994. The trial judge concluded, inter alia, that the estate was not entitled to a theft loss deduction for the funds which Lynch and Reardon had failed to return to the estate despite the order of the Orphans' Court that they do so. The tax court adopted the trial judge's findings and conclusions in an opinion filed February 15, 1996. See Estate of Meriano v. Commissioner, T.C. Memo 1996-58, 1996 WL 64854 (U.S.T.C. filed February 15, 1996). The estate now appeals the tax court's denial of its theft loss deduction.

10

II. DISCUSSION

The tax court determined that the estate was entitled neither to a theft loss deduction nor to a deduction for a portion of the administrative expenses taken by its attorneys. See Estate of Meriano, T.C. Memo 1996-58 at 84, 101. The estate does not appeal the tax court's disposition of issues regarding the deductibility of administrative expenses. Consequently, our concern is whether the estate is entitled to theft loss deduction for some or all of the money owed to it by Reardon and Lynch.6  We exercise jurisdiction over the tax court's decision pursuant to 16 U.S.C. S 7482(a). We review the tax court's legal determinations de novo. We do not disturb the tax court's factual findings unless they are clearly erroneous. See Gulf Oil Corp. v. Commissioner, 914 F.2d 396, 399 (3d Cir. 1990).

The estate maintains that it is entitled to an appropriate theft loss deduction for the portion of Lynch and Reardon's withdrawals that were adjudged excessive by the Orphans' Court but never reimbursed to the estate. Section 2054 of the tax code provides that:

> [T]he value of the taxable estate shall be determined by deducting from the value of the gross estate losses incurred during the settlement of estates arising from fires, storms, shipwrecks, or other casualties, or from theft, when such losses are not compensated for by insurance or otherwise.

26 U.S.C. S 2054. Because Section 2054 has generated

_____

6. The estate also raises several evidentiary issues on appeal. According to the estate, the tax court committed error reversible error when it: (1) failed to admit "expert" testimony regarding the proper interpretation of Pennsylvania criminal law; (2) refused to admit the Orphans' Court opinions as well as the testimony contained within those proceedings of Anthony Orlando, who had died by the time the tax court proceeding was under way; (3) rejected the estate's request to treat Lynch and Reardon as hostile witnesses on direct examination; and (4) prevented the estate from proffering evidence that Lynch might have commingled funds or hidden assets while he was managing the estate's securities.

In light of our holding, we need not address the merits of these issues.

11

relatively little case law, we must examine those cases that have defined "theft" as it appears in Section 165, which permits taxpayers to take theft loss deductions on their income tax.7 See Estate of Max Schlensky v. Commissioner, T.C. Mem. 1977-148, 1997 WL 3444.

"Theft," as it appears in Sections 165 and 2054, is defined by the jurisdiction in which the loss has occurred. See e.g. Lombard Brothers, Inc. v. United States, 893 F.2d 520, 523 (2d Cir. 1990); Bagur v. Commissioner, 603 F.2d 491, 501 (5th Cir. 1979); Bellis v. Commissioner , 540 F.2d 448, 449 (9th Cir. 1976).8 The estate and Commissioner agree that, to the extent state law controls the outcome of this case, the applicable law is that of Pennsylvania. See Joint Stipulation of Facts, P 28. The estate must prove its entitlement to the deduction by a preponderance of evidence. See Howard v. United States, 497 F.2d 1270, 1272 n.4 (7th Cir. 1974); Farcasanu v. Commissioner, 436 F.2d 146, 150 n.3. (D.C. Cir. 1970). See also Tax Court Rule 142(a).

According to the estate, the facts of this case amount to theft under two provisions of Pennsylvania's Criminal Code: 18 Pa.C.S. S 4113, for misapplication of entrusted property; and 18 Pa.C.S. S 3927, for theft by failure to make required disposition of funds received. Because Section 3927 adequately resolves this case in the estate's favor, we will not consider whether the estate is also eligible for a theft loss deduction under Section 4113.

Section 3927 provides in pertinent part:

>     (a) Offense defined– A person who obt ains property
>     upon agreement, or subject to a known legal obligation,

_____

7. Section 165(c)(3) allows a taxpayer to take a deduction for "losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck or other casualty, or from theft." 26 U.S.C. S165(c)(3).

8. "[T]he exact nature of the crime, whether larceny or embezzlement, of obtaining money under false pretenses, swindling or other wrongful deprivations of the property of another, is of little importance so long as
it amounts to theft." Edwards v. Bromberg, 232 F.2d 107, 111 (5th Cir. 1956).

> to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition.

18 Pa.C.S. S 3927(a). The Pennsylvania Supreme Court has interpreted Section 3927 as consisting of four elements:

> 1. The obtaining of property of another;
>
> 2. Subject to an agreement or known legal obligation upon the recip[ient] to make specified payments or other disposition thereof;
>
> 3. Intentional dealing with the property obtained as the defendant's own; and
>
> 4. Failure of the defendant to make the required disposition of the property.

Commonwealth v. Turrell, 584 A.2d 882, 884 (Pa. 1990), quoting Commonwealth v. Ohle, 470 A.2d 61, 69 (Pa. 1983) and Commonwealth v. Crafton, 240 Pa.Super. 12, 16, 367 A.2d 1092, 1094-95 (1976). See also Commonwealth v. Van Nest, 517 Pa. 44, 50, 534 A.2d 473, 476 (Pa. 1987). Before we decide whether the estate has demonstrated the existence of these four elements, we must first address the Commissioner's contention that the Section 3927 contains a fifth element, the presence of "thieving intent."

A. Thieving Intent

According to the Commissioner and the tax court, the estate is ineligible for a theft loss deduction because it failed to prove that Lynch or Reardon possessed "thieving state[s] of mind" when they charged excessive fees to the estate and failed to pay them back at the request of the Orphans' Court. See Meriano, T.C. Memo 1996-58 at 76, 84. We believe the tax court's has misconstrued Pennsylvania's criminal law.

13

We find nothing in Pennsylvania case law to support the proposition that the presence of thieving intent is a separate and additional element of liability under Section 3927. Neither of the two Pennsylvania Superior Court decisions cited by the tax court demonstrate the existence of a fifth element under Section 3927. See Commonwealth v. Kuykendall, 465 A.2d 29, 31–32 (Pa. Super. 1983); Commonwealth v. Shaffer, 420 A.2d 722, 726 (Pa. Super. 1980). Neither Kuykendall nor Shaffer even mention Section 3927. Instead, both cases stand for the unextraordinary principle that a person who has misappropriated property can be prosecuted under 18 Pa. C.S. S 3925 as a receiver of property, so long as that person possesses a "thieving state of mind." This result follows from 18 Pa. C.S.S 3902, which consolidates all theft offenses at trial. Thus, a defendant accused of one type of theft under one section of Pennsylvania's Crime Code may be convicted with evidence demonstrating a different type of theft under the Code. Section 3902 thus establishes that theft is a unitary offense in Pennsylvania. Under this consolidation of theft offenses, a "thieving state of mind" is the essence of a theft charge. Commonwealth v. Robichow, 487 A.2d 1000, 1003 (Pa. Super. 1985) (quoting Shaffer, 420 A.2d 722). The Commissioner contends that it is this "thieving state of mind" that is lacking here.

However, the Superior Court elaborated on the unitary concept of theft under the Pennsylvania criminal code in Robichow. There, the Superior Court explained that, under Section 3927, the taking of another's property subject to a known obligation and the intentional disposition of it as one's own constituted the "thieving state of mind" necessary to prove theft. See Robichow, 338 Pa. Super. at 356, 487 A.2d at 1004–1005. Thus, Robichow did not treat "thieving intent" as a separate element of Section 3927. To the contrary, it held that such intent was present when the four traditional elements of the offense were already present.

We are aware that ultimately our determination of this issue turns on the pronouncements of Pennsylvania's highest court, not its Superior Court. "[W]hen federal courts are required to interpret or apply state law, we consider and

14

accept the decisions of the state's highest court as the ultimate authority of state law." Colantuno v. Aetna Ins. Co., 980 F.2d 908, 909 (3d Cir. 1992). Of the recent Pennsylvania Supreme Court cases discussing Section 3927, none has even mentioned the concept of "thieving intent," much less treated it as a separate prerequisite for criminal liability. See e.g. Turrell, 584 A.2d at 884 (criminal violation occurs when individual "evinces intent not to make the required payment or disposition"). Based on the Pennsylvania Supreme Court's discussion of Section 3927, we must conclude that "thieving intent" insofar as it is an element of an offense under section 3927, is established when the elements of the taking of another's property subject to a known obligation and of the intentional disposition of it as one's own have been established. It is not a separate fifth element of this crime. In sum, we do not think that the Commissioner's reading of Section 3927 represents an accurate interpretation of Pennsylvania criminal law.

B. Liability for Theft Under Section 3927

Having rejected "thieving intent" as a fifth element, we now consider whether the estate proved by a preponderance of evidence that it was a victim of theft as defined by Section 3927. We will examine each element of Section 3927 separately.

 1. Property of another. Under the first element of Section 3927, the estate must show that Lynch and Reardon took "property of another." According to the Commissioner, Lynch and Reardon did not acquire "property of another" when they converted the estate's securities and withdrew a portion of their proceeds from the estate prior to the Orphans' Court's approval of their fees. We disagree. We believe that under Pennsylvania's probate law, the moneys withdrawn from the estate constituted "property of another" despite Mary Orlando's prior approval of the estate's disbursements to Lynch and Reardon.

Section 3927 does not explicitly refer to "property of another." Judicial precedent, however, has made it an element of this crime. See e.g. Turrell, 584 A.2d at 884. Pennsylvania statutory law defines "property of another" to

15

include "property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property." 18 Pa. C.S. S 3901. The Commissioner maintains that the definition contained in Section 3901 applies only to statutory uses of the term. We disagree. Common sense dictates that the Pennsylvania courts would define "property of another" uniformly for all theft offenses, regardless of whether that term appears explicitly in the statute. At least one court has implicitly defined the "property of another" element in Section 3927 by referring to Section 3901. See Commonwealth v. Edwards, 582 A.2d 1078, 1086 (Pa. Super. 1990).

Applying Edwards and the language of Section 3901, we believe that "property of another" includes property in which a person has an interest that may not be infringed by someone else. Our conclusion is supported by the Pennsylvania Supreme Court's holding that a victim need not maintain absolute title over property to claim theft by wrongful disposition of funds received. See Commonwealth v. Rosenzweig, 522 A.2d 1088, 1092-93 (Pa. 1987). Thus, the estate may prove theft so long as it shows that it had some legal interest in the securities withdrawn and converted by Lynch and Reardon as payment of their fees.

Our review of Pennsylvania's probate law leads us to conclude that, prior to the Orphans' Court's audit and final approval of the estate's distribution, the estate maintained an interest in the fees withdrawn by Lynch and Reardon, and that neither Lynch nor Reardon was entitled to infringe this interest, regardless of Mary Orlando's prior approval of their fees and withdrawals.

Although Pennsylvania probate law allows a personal representative (administrator or executor) to distribute real or personal property prior to a court's final disposition of an estate's account, the personal representative does so at his or her own risk. See 20 Pa. C.S. 3532. "Fiduciaries who pay out funds in their hands without an audit of their accounts do so at their own risk." In re Free's Estate , 194 A. 492, 495 (Pa. 1937). See also In re Estate of Comerford, 130 A.2d 458, 465 n. 11 (Pa. 1957); Estate of Pew, 655 A.2d 521, 538 (Pa. Super. 1994). Cf. Heaney v. Riddle, 23 A.2d 456,

16

459 (Pa. 1942) (trustees who distributed funds of dissolved corporation without prior approval of court did so at their own risk and could be held responsible for payments later determined to be improper). The Orphans' Court may direct the estate's fiduciary to reimburse the estate if, upon auditing the estate's final account, the court finds the fiduciary's prior distributions to be improper or unreasonable. See In re Free's Estate., 194 A. at 495. Since Reardon's investigative fee was disbursed to him pursuant to the approval of Mary Orlando, the estate's fiduciary and personal representative, his fee was subject to the review and approval of the Orphans' Court.

The payment of an attorney's fee prior to the Orphans' Court's audit and approval of the estate's account is also treated as an at-risk distribution. It is well established that the Orphans' Court's may review the reasonableness of the attorney's fee and order the estate's personal representative to reimburse the estate for some or all of the disbursed fees if it finds the fees to be excessive, unreasonable or otherwise undeserved. See Estate of Alla Bruner, 691 A.2d 530, 534 (Pa. Super. 1997) (auditing judge may reduce excessive and unreasonable attorney's fees); In re Estate of Geniviva, 675 A.2d 306, 313 (Pa. Super. 1996); In re Estate of Rees, 625 A.2d 1203, 1206 (Pa. Super. 1993); In re Estate of Sonovick, 541 A.2d 374, 376 (Pa. Super. 1988) (Orphans' Court has authority to reduce fees and commissions of estate's fiduciaries to "reasonable and just" level).9

Ordinarily, the Orphans' Court surcharges the estate's fiduciary for the value of excessive fees or wrongful appropriations. The Orphans' Court's jurisdiction, however,

_____

9. In reviewing the reasonableness of an attorney's fees, the auditing court considers:

> the amount of work performed, the character of the services rendered, the difficulty of the problems encountered, the value of the
> property in question, the degree of responsibility involved, the professional skill of the individuals rendering the services, the standing of the attorney in her profession and the ability of the estate to pay a reasonable fee.

Bruner, 691 A.2d at 534.

17

does not end here. Consistent with its powers as a court of chancery, the Orphans' Court may also compel payment from the fiduciary's agent when it determines that the agent is in possession of assets belonging to the estate. See In re Estate of Webb, 138 A.2d 435 (Pa. 1958) (Orphans' Court may compel realtors acting as administrators' agents to turn over property belonging to decedent's estate); In re Watts' Estate, 27 A. 861 (Pa. 1893) (Orphans' Court has jurisdiction to compel administrator's attorney to turn assets over to estate).

Thus, the Orphans' Court clearly had the power to review Lynch and Reardon's fees, to reduce those fees if it found them to be excessive or unreasonable, and to order Lynch and Reardon to refund the value of any securities which the Court found to be wrongfully taken from the estate. As the Pennsylvania Supreme Court proclaimed nearly a century ago, "[T]he orphans' court has jurisdictionfinally to decide the question of ownership and compel a surrender to a decedent's estate of assets improperly held by one whose title is colorable only." In re Williams' Estate, 84 A. 848, 852 (Pa. 1912) (emphasis added). Because, the estate maintained a proprietary interest in any distributions prior to the Orphans' Court's approval, the funds withdrawn by Lynch and Reardon qualified as "property of another." The first prong of Section 3927 is therefore satisfied.

 2. Subject to known legal obligation. To prove theft, the estate must also show that Lynch and Reardon obtained property subject to an agreement or known legal obligation to make specified payments or otherwise dispose of the property. The record reflects that the estate meets this element of Section 3927.

First, Robert Boote, an attorney familiar with probate law, testified at trial that attorneys who took fees from their clients prior to an accounting "all know that [they] are subject to ultimate approval by the court." Appendix, at 281-82. The Commissioner did not rebut this testimony. As an attorney, Lynch was aware of Pennsylvania probate law. Second, Lynch and Reardon both testified at trial that they were aware that their fees were subject to the Orphans' Court's approval. See Appendix, at 441; 584-85. Finally, the hold harmless agreement imposed a contractual obligation

18

on Lynch and Reardon to reimburse the estate for "any and all amounts received that are determined by a court of proper jurisdiction to be returnable to the Estate." Appendix, at 109.

Thus, both Pennsylvania's probate law and the hold harmless agreement voluntarily entered into by Lynch and Reardon imposed on them a legal obligation to maintain the funds withdrawn from the estate until the Orphans' Court approved their fees. The second element of Section 3927 is thus present.

3. Intentional disposition of property as one's own. Both Lynch and Reardon disposed of the funds withdrawn from the estate for their own purposes. Lynch testified that after he converted and withdrew the securities from the estate, he deposited them in an account with some personal funds. Appendix, at 444. Shortly after the Pennsylvania Supreme Court refused to hear Lynch's appeal of the Orphans' Court's judgment, Lynch declared bankruptcy because he was in "financial distress." Appendix, at 432. From this testimony, we conclude that Lynch had spent the funds and thus disposed of them as his own.[10]

As for Reardon, he testified at trial that he had used the money to pay his own legal fees and taxes. See Appendix, at 589–90. Thus, Reardon treated the remaining funds as his own. See Turell, 584 A.2d at 884 (attorney who used funds in client's escrow account to pay his own income taxes committed theft under Section 3927).

4. Failure to make required disposition. Once the Orphans' Court issued its judgment, Lynch and Reardon's obligation to repay the estate became final. Neither Lynch

_____

10. The trial court did not permit the estate to present testimony demonstrating that Lynch commingled the estate's funds with his own. We agree that commingling, by itself, does not demonstrate liability under Section 3927. See Turell, 584 A.2d at 886. However, insofar as Lynch's commingling of funds might have been circumstantial evidence of his intention to treat the funds as his own, the evidence still may have
been relevant and therefore admissible. We need not address this issue, however, since we decide the case in the estate's favor.

nor Reardon, however, satisfied the Orphans' Court's judgment.

Lynch has paid the estate nothing since the Orphans' Court's judgment was affirmed. At trial, he testified that he did not have the funds to do so. Appendix, at 433. Lynch therefore committed theft under Section 3927 since he failed to dispose of the funds with the estate as directed by the Orphans' Court. "[A]ssuming all the other elements have been satisfied, once payment is required and an attorney fails to make such payment, then a violation of S 3927(a) has occurred." Turrell, 584 A.2d at 886 (attorney who obtained funds upon express agreement that they be held in escrow account committed theft when he failed to dispose of them in agreed upon manner).

Like Lynch, Reardon also committed theft, although the facts surrounding his failure to repay the estate are slightly more complicated. At trial, Reardon testified that he had entered into an agreement with the estate, releasing him from the Orphans' Court judgment in an exchange for an amount less than that charged to him. The date of the agreement, as well as the amount Reardon agreed to pay, were not disclosed at trial.11 The parties apparently agree, however, that Reardon paid $25,000 to the estate as partial satisfaction of his agreement.

Reardon's release and partial payment of this undisclosed sum does not negate our conclusion that he committed theft within the meaning of Section 3927. The fact that the estate attempted to cut its losses by negotiating a deal with Reardon does not negate the fact that it was the victim of theft. To the contrary, the Pennsylvania Supreme Court has

_____

11. The tax court accepted Reardon's testimony that the estate had released him from his obligation to pay the Orphans' Court's judgment in exchange for a negotiated lesser amount. See Meriano, T.C.Mem. 1996-58 at 37-38, 39. Although the estate has questioned the validity of Reardon's agreement in supplemental briefing before this Court, it has not specifically challenged the tax court's finding as clearly erroneous. Accordingly, the estate has waived any argument about the authenticity of the agreement. See Lunderstadt v. Colafella, 885 F.2d 66, 78 (3d Cir. 1989) (appellants must raise issue in opening appeal brief to preserve it).
We therefore assume that the agreement is valid.

20

held that a defendant's restitution has no bearing on his criminal liability for theft:

> We agree that criminal liability attaches as soon as the failure to make a required distribution of funds occurs, but reject the view that liability can be negated through a return of the misappropriated funds. The crime is complete when all of its elements have been fulfilled, and, once completed, it cannot be undone. Certainly, where an offender has made restitution, and particularly where restitution has been made before the filing of criminal charges, this can be considered by a sentencing court as a significant factor in mitigation of the punishment to be imposed. Restitution does not, however, negate the fact that a crime has been committed.

Turrell, 584 A.2d at 886. As soon as Reardon failed to pay the Orphans' Court's judgment and spent the money on his own legal fees and taxes, he violated Section 3927. Neither the estate's release nor Reardon's later payment of $25,000 negates that fact.

In sum, the four elements of theft by failure to make required disposition of funds received have been satisfied by the facts of this case.

C. Collection Efforts

Finally, we note that the Commissioner questions the authenticity of the estate's theft claim on the ground that the estate failed to exercise adequate efforts to collect the money owed to it once the Orphans' Court rendered judgment against Lynch and Reardon. The Commissioner's argument appears to be that if theft "really" had occurred, the estate would have been more persistent in its efforts to collect the moneys owed to it. The tax court accepted this argument when it concluded that "this was merely a fee dispute between Lynch and the present administratrix of the estate." Meriano, T.C. Memo 1996-58 at 35.12

_____

12. In describing this situation as "merely a fee dispute," the tax court did not take into account the requirement that fees, charged against an estate, must receive the ultimate approval of the Orphans' Court. See Part II.B.1 and 2, supra.

21

We find the reasoning of the tax court and the Commissioner to be without merit. The victim's pursuit of the person who has misappropriated its property is not an element under Section 3927. We believe that, once the four elements of Section 3927 are present, a theft has occurred, regardless of whether the victim attempts to retrieve the stolen property. Theft is measured by the thief 's, and not the victim's, actions and intentions. Thus, it is completely irrelevant how much (or little) effort the estate expended in trying to get its money back, or whether the estate viewed itself as a victim of theft immediately after the Orphans' Court rendered its judgment.13

Our only concern is whether Lynch and Reardon obtained property of another, subject to a known legal obligation, and then intentionally treated that property as their own and failed to make a required disposition of property. Having found each of the four elements present in this case, we must conclude that they committed theft under Pennsylvania law and that the estate was entitled to take a theft loss deduction pursuant to Section 2054 of the tax code.

III. THE AMOUNT DEDUCTIBLE

We now turn to the issue of how much the estate may deduct for its theft loss under Section 2054. Although the estate initially argued in its opening brief that it was entitled to deduct the full amount of the Orphans' Court's judgment, it eventually conceded in supplemental briefing that it could not deduct the $25,000 repaid to it by Reardon. Thus, the estate currently claims that it is entitled to a deduction of $249,509.09. This amount represents the

_____

13. We do note that an estate's refusal to collect money owed to it could potentially disqualify it for a federal estate tax deduction under Section 2054. Ordinarily, a taxpayer seeking a theft loss deduction on income tax must demonstrate that there is no "reasonable prospect of recovery." 26 C.F.R. S1.165-1(d)(2)(I) and 1.165-8(a)(2). The Commissioner waived any argument with regard to this issue when she stated at trial that collection was not in issue. See Appendix at 445, 587, 590 and 614.

22

total amount of money owed to the estate by Lynch and Reardon, minus the $25,000 paid by Reardon.14

Under the tax regulations, when an estate is partially compensated for its loss, it may take a deduction on the remaining portion. See 26 C.F.R. S 20.2054-1. Since the estate has not received any compensation from Reardon other than the $25,000, the estate may deduct the remainder of Reardon's debt, notwithstanding its agreement with Reardon to accept an undisclosed lesser amount.

IV. CONCLUSION

Because the estate has demonstrated theft under Section 3927 of the Pennsylvania criminal code, we will reverse the tax court's denial of a theft deduction to the estate. The estate is therefore entitled to deduct from its estate taxes the sum of $249,509.09, the remainder due to it under the Orphan Court's judgment.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

14. We note that the estate is not entitled to deduct the interest the Orphans' Court ordered Lynch and Reardon to pay. Federal estate tax applies only to the moneys contained in the estate at the time of a decedent's death. See generally 26 U.S.C.S 2031(a). Money generated after the decedent's death is not included in the gross estate for estate tax purposes, but is instead taxed as income under 26 U.S.C. S 641(a)(3) for income tax purposes. See Horne v. Commissioner, 91 T.C. 100, 103 (Tax Court 1988); Bowes v. United States, 593 F.2d 272, 275 (7th Cir. 1979). Thus, the interest on the excess fees has never been considered part of the gross estate for estate tax purposes. The estate therefore may not include the interest on Lynch and Reardon's surcharges in its theft loss deduction.